[No. S055373. Feb. 23, 1998.]

STOP YOUTH ADDICTION, INC., Plaintiff and Appellant, v. LUCKY STORES, INC., Defendant and Respondent.

554

## COUNSEL

Donald P. Driscoll and William M. Henley for Plaintiff and Appellant.

Louise H. Renne, City Attorney (San Francisco), Dennis Aftergut, Chief Assistant City Attorney, Elizabeth D. Laporte, Andrew Y. S. Cheng and Jayne C. Lee, Deputy City Attorneys, Scot D. Bernstein, Richard F. Ellers and Eric Berliner as Amici Curiae on behalf of Plaintiff and Appellant.

Gibson, Dunn & Crutcher, Gail E. Lees, Richard D. Gluck, John A. Arguelles and Lincoln D. Bandlow for Defendant and Respondent.

Daniel E. Lungren, Attorney General, Thomas F. Gede, Assistant Attorney General, Fred J. Hiestand, Fred L. Main, Daniel J. Popeo, Paul D. Kamenar, Haight, Brown & Bonesteel, Jeffrey B. Margulies, Livingston & Mattesich, Carol Livingston, Gene Livingston, Horvitz & Levy, Lisa Perrochet, David M. Axelrad, Skadden, Arps, Slate, Meagher & Flom, Charlotte A. Lowell, Rogers, Joseph, O'Donnell & Quinn, Renee D. Wasserman and Sean M. SeLegue as Amici Curiae on behalf of Defendant and Respondent.

Dean Flippo, District Attorney (Monterey), Lydia Villarreal, Deputy District Attorney, Thomas J. Orloff, District Attorney (Alameda), Christopher C. Carpenter, Assistant District Attorney, Lawrence G. Brown, James C. Sturdevant, Ian Herzog, Mary E. Alexander, Bruce A. Broillet, David S. Casey, Jr., Deborah David, Douglas Devries, Laurence E. Drivon, Thor Emblem, Joseph F. Harbison III, Steven J. Kleifield, Harvey R. Levine, Moses Lebovits, Wayne McClean, David A. Rosen, Leonard Sacks, Daniel U. Smith, Chris Spagnoli, Robert B. Steinberg, Tony Tanke, Lea-Ann Tratten, Rick Simons, Thomas G. Stoplman, William D. Turley, Roland Wrinkle, Earl Lui, Kenneth W. Babcock, Kathleen A. Michon, Richard A. Rothschild, Bet Tzedek Legal Services and David A. Lash as Amici Curiae.

## OPINION

**WERDEGAR, J.**—The question presented is whether a private, for-profit corporation may maintain on behalf of the general public an unfair competition action against a retailer that, in violation of the Penal Code, sells cigarettes to minors. We conclude such an action is authorized under Business and Professions Code[1] sections 17200 through 17209 (the unfair competition law, or UCL).[2] Accordingly, we affirm the judgment of the Court of Appeal.

## FACTS

■ "Because this matter comes to us after the trial court sustained the defendant's demurrer, 'we must, under established principles, assume the truth of all properly pleaded material allegations of the complaint in evaluating the validity' of the decision below." (*Lazar* v. *Superior Court* (1996) 12 Cal.4th 631, 635 [49 Cal.Rptr.2d 377, 909 P.2d 981], quoting *Tameny* v. *Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 170 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314].) Plaintiff Stop Youth Addiction, Inc. (SYA) alleges, inter alia:

SYA, a California corporation, brings this action in the public interest.

Defendant Lucky Stores, Inc. (Lucky) and numerous other retailers in Northern California sell cigarettes to minor children in violation of Penal Code section 308. Many of these children become addicted to cigarettes, as they would not have had Lucky not illegally sold them cigarettes. Lucky profits from addicting such children to cigarettes because many, unable to overcome their addiction, return to buy cigarettes as both children and adults.

Approximately 90 percent of cigarette sales in northern California are to children or to adults who were addicted as children and who would like, but

---

[1]Except as otherwise noted, unlabeled section references are to this code.

[2]Sections 17200 through 17209 do not presently bear a legislatively imposed title or name, and we have variously referred to them. (See, e.g., *Manufacturers Life Ins. Co.* v. *Superior Court* (1995) 10 Cal.4th 257, 263 [41 Cal.Rptr.2d 220, 895 P.2d 56] [Unfair Competition Act]; *Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1260 [10 Cal.Rptr.2d 538, 833 P.2d 545] [Unfair Business Practices Act]; *Farmers Ins. Exchange* v. *Superior Court* (1992) 2 Cal.4th 377, 395 [6 Cal.Rptr.2d 487, 826 P.2d 730] [Unfair Practices Act].) Most recently, we noted that sections 17200 through 17209 "together are sometimes referred to as the 'unfair competition law' " (*ABC Internat. Traders, Inc.* v. *Matsushita Electric Corp.* (1997) 14 Cal.4th 1247, 1252 [61 Cal.Rptr.2d 112, 931 P.2d 290], citing *Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 209 [197 Cal.Rptr. 783, 673 P.2d 660]), and we adhere now to that locution.

are unable, to quit smoking. Consequently, Lucky has unjustly enriched itself in an amount equal to 90 percent of its gross profits from the sale of cigarettes. Every dollar Lucky obtains through such cigarette sales results, on average, in more than a dollar spent on health care by the State of California.

SYA prays for $10 billion in restitution to be paid to the State of California, an injunction forbidding Lucky to sell cigarettes to children, costs and reasonable attorney fees.

The superior court sustained Lucky's general demurrer without leave to amend, opining that section 308, which prohibits the knowing sale of cigarettes to minors, "preempts" all private enforcement of section 308. The Court of Appeal, relying on our decisions in *People* v. *McKale* (1979) 25 Cal.3d 626 [159 Cal.Rptr. 811, 602 P.2d 731] and *Committee on Children's Television, Inc.* v. *General Foods Corp.*, *supra*, 35 Cal.3d 197 (*Children's Television*), reversed the superior court's order sustaining Lucky's demurrer. We granted Lucky's petition for review.

### DISCUSSION

We note at the outset what is *not* before us on review. Lucky and supporting amici curiae have attempted to call into question plaintiff's and its counsel's motives in prosecuting this action. Lucky points to plaintiff's for-profit status, requests judicial notice of similar actions plaintiff has filed, and notes that plaintiff names many retailer defendants. Lucky also notes one court in a different case filed by plaintiff noted with concern evidence of attempts by plaintiff's counsel to obtain monetary payments from certain defendants prior to filing the lawsuit. Lucky also suggests plaintiff's methods of gathering evidence were unlawful and that plaintiff brings this case for its own and its attorney's financial gain.

These are important concerns. As discussed below, no conclusion we reach respecting the viability of this action at demurrer stage should be taken as countenancing the illegal gathering of evidence. Generally, however, we agree with amicus curiae the California District Attorneys Association (CDAA) that only the sufficiency of plaintiff's complaint, not the seemliness of its litigation strategy or its counsel's motives, is properly before us on review at this time.[3]

As a threshold matter, it is plain that SYA, in alleging Lucky violates Penal Code section 308 in its retailing activities, adequately alleges unfair

---

[3]Accordingly, and as " '[m]atters otherwise subject to judicial notice must be relevant to an issue in the action' " (*Mangini* v. *R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1062 [31

competition.[4] The UCL defines "unfair competition" as ". . . any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ." (§ 17200.) As we recently explained in reviewing the scope and purpose of the unfair competition law and its remedial provisions, "[t]he Legislature intended this 'sweeping language' to include ' "anything that can properly be called a business practice and that at the same time is forbidden by law." ' " (*Bank of the West* v. *Superior Court*, *supra*, 2 Cal.4th at p. 1266, quoting *Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94, 111, 113 [101 Cal.Rptr. 745, 496 P.2d 817].)

Indeed, in expressly conceding "the right of . . . public prosecutors to bring claims under section 17200 such as those at issue here, to supplement the prosecutors' enforcement rights under Penal Code section 308," Lucky impliedly concedes claims under section 17200 such as those at issue here are properly stated, i.e., that selling cigarettes to minors is unfair competition under the statute.

Lucky nevertheless contends the Court of Appeal erred in ruling this action may proceed. Lucky argues SYA's suit is barred *both* by the UCL (because, according to Lucky, SYA lacks standing to bring a UCL action predicated on violation of a statute for the direct enforcement of which there is no private right of action) *and* by Penal Code section 308 (because, Lucky asserts, section 308, together with the Stop Tobacco Access to Kids Enforcement Act, Business and Professions Code sections 22950-22959 (STAKE Act), embodies the Legislature's intent to create a comprehensive, exclusive scheme for combating the sale of tobacco to minors). Lucky also contends various public policy considerations militate against permitting this action to survive demurrer.

### 1. Standing

Section 17204 provides, in full: "Actions for any relief pursuant to this chapter shall be prosecuted exclusively in a court of competent jurisdiction by the Attorney General or any district attorney or by any county counsel

---

Cal.Rptr.2d 358, 875 P.2d 73], quoting 2 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 47.1, p. 1749), we deny Lucky's request for judicial notice of SYA's other complaints.

[4]The complaint is quite brief (only two pages); amicus curiae CDAA (even while urging affirmance) suggests, citing *People* v. *McKale, supra*, 25 Cal.3d at page 635, that Lucky should have challenged it as "inadequate and perfunctory." CDAA points out that section 308 penalizes only sales of tobacco to minors made "knowingly" (§ 308, subd. (a)) and suggests no allegation of knowledge has been made. We need not address whether the general allegation Lucky's conduct is "in violation of California Penal Code [section] 308" sufficiently pleads the factual underpinning of that statutory violation, for Lucky, as CDAA points out, based its demurrer entirely on the legal ground that a cause of action could never be stated and did not contest the adequacy of the skeletal complaint.

authorized by agreement with the district attorney in actions involving violation of a county ordinance, or any city attorney of a city, or city and county, having a population in excess of 750,000, and, with the consent of the district attorney, by a city prosecutor in any city having a full-time city prosecutor or, with the consent of the district attorney, by a city attorney in any city and county in the name of the people of the State of California upon their own complaint or upon the complaint of any board, officer, person, corporation or association *or by any person acting for the interests of itself, its members or the general public.*" (Italics added.)

█ Amicus curiae Association for California Tort Reform (ACTR) suggests that, from a grammatical perspective, section 17204 confers UCL standing only on the public prosecutors listed therein. More specifically, as ACTR would parse the statute, all that "any person acting for the interests of itself, its members or the general public" (§ 17204) may do about unfair competition is to complain about it to one of the officials, as appropriate, listed in the statute, e.g., the Attorney General, district attorney, county counsel or city prosecutor.

ACTR's strained construction is contrary to our previous pronouncements. As Lucky concedes, pursuant to section 17200 as construed by this court and the Courts of Appeal, "a private plaintiff who has himself suffered no injury at all may sue to obtain relief for others." (See, e.g., *Children's Television, supra,* 35 Cal.3d at p. 211; *Hernandez* v. *Atlantic Finance Co.* (1980) 105 Cal.App.3d 65, 71-73 [164 Cal.Rptr. 279].) That the Legislature in section 17204 used the disjunctive when listing the entities empowered to bring UCL "[a]ctions for . . . relief" plainly suggests it meant to designate such entities in the alternative. Amicus curiae points to nothing that contravenes such a plain reading of the statute.

█ More moderately, Lucky argues SYA should not be permitted to use the UCL to obtain relief, indirectly, for violation of an underlying statute—Penal Code section 308—that SYA is not authorized to enforce directly. According to Lucky, the only reasonable construction of the UCL is that its remedies are not available to private parties if the Legislature did not include an express private right of action in the enforcement scheme for the underlying law. Moreover, as Lucky interprets them, our previous pronouncements establish " 'the Business and Professions Code provides no toehold for scaling the barrier' " (*Rubin* v. *Green* (1993) 4 Cal.4th 1187, 1202 [17 Cal.Rptr.2d 828, 847 P.2d 1044], quoting *Safeco Ins. Co.* v. *Superior Court* (1990) 216 Cal.App.3d 1491, 1494 [265 Cal.Rptr. 585]

(*Safeco*)) purportedly created in this case by what Lucky characterizes as the Legislature's "denial" of a private right of action to enforce section 308.[5]

Lucky cannot mean to suggest that either Penal Code section 308 or the STAKE Act contains any express reference to the UCL; neither does. We previously have held, moreover, that "whether a private right of action should be *implied* under [the predicate] statute . . . is immaterial since any unlawful business practice . . . may be redressed by a private action charging unfair competition in violation of Business and Professions Code sections 17200 and 17203." (*Children's Television, supra,* 35 Cal.3d at pp. 210-211, italics added, fns. omitted; see also *id.* at pp. 214-215; see, e.g., *Fenning* v. *Glenfed, Inc.* (1995) 40 Cal.App.4th 1285 [47 Cal.Rptr.2d 715] [UCL action based on violation of Office of Thrift Supervision regulations]; *Rubin* v. *Green, supra,* 4 Cal.4th 1187 [UCL action based on unlawful client solicitation]; *Consumer's Union of United States, Inc.* v. *Fisher Development, Inc.* (1989) 208 Cal.App.3d 1433 [257 Cal.Rptr. 151] [UCL action to enforce Unruh Civil Rights Act]; *People* v. *McKale, supra,* 25 Cal.3d 626 [UCL action based on violation of Mobilehome Parks Act].) Thus, as we have long recognized, it is in enacting the UCL itself, and not by virtue of particular predicate statutes, that the Legislature has conferred upon private plaintiffs "specific power" (*People* v. *McKale, supra,* 25 Cal.3d at p. 633) to prosecute unfair competition claims.

Lucky, suggesting it was dictum, urges us to reconsider our statement in *Children's Television* respecting the "immateriality" for UCL standing of the private enforceability *vel non* of particular predicate statutes. As the Court of Appeal discerned, however, the question we answered in *Children's Television* about the source of UCL standing was "*actually involved* and actually decided" (*Childers* v. *Childers* (1946) 74 Cal.App.2d 56, 61 [168 P.2d 218], italics in original) in that case. In *Children's Television* the parties "vigorously dispute[d]" whether a private right of action should be implied under the statute at issue (the Sherman Food, Drug and Cosmetic Law, Health & Saf. Code, former § 26000 et seq.; (the Sherman Law)). (*Children's Television, supra,* 35 Cal.3d at p. 210.) We held, inter alia, that "any advertising scheme involving false, unfair, misleading or deceptive advertising of food products equally violates" the Sherman Law, the UCL and the false advertising law (*Children's Television, supra,* 35 Cal.3d at p. 211), deriving that

---

[5]Lucky's briefing blurs what are really two separate arguments against the existence of a UCL cause of action for violations of Penal Code section 308. On the one hand, whether the UCL requires that the underlying statute have a direct right of action turns primarily on the Legislature's intent in enacting and amending the UCL. On the other hand, whether the Legislature intended that section 308 not serve as the basis for a UCL action turns primarily on the Legislature's intent in enacting section 308 and (according to Lucky) the STAKE Act. As will be seen, Lucky fails to demonstrate that either aspect of relevant legislative intent deprives plaintiffs of standing to maintain the present action.

conclusion, in part, from the observation that "whether a private right of action should be implied" under the Sherman Law was "immaterial," since the plaintiff could in any event state "a private action charging unfair competition" (*id.* at pp. 210-211). As our holding depended on it, our observation concerning the immateriality of an underlying private right of action was, contrary to Lucky's contention, *not* dictum.

Although *Children's Television* has been the law since 1983, the Legislature did not address the decision when it amended section 17200 in 1992. (See Stats. 1992, ch. 430, p. 1707.) ■ Of course, any "presumption of legislative acquiescence in prior judicial decisions is not conclusive in determining legislative intent" (*Harris* v. *Capitol Growth Investors XIV* (1991) 52 Cal.3d 1142, 1156 [278 Cal.Rptr. 614, 805 P.2d 873]); legislative silence after a court has construed a statute gives rise at most to an arguable inference of acquiescence or passive approval (*ibid.*, citing *Cianci* v. *Superior Court* (1985) 40 Cal.3d 903, 923 [221 Cal.Rptr. 575, 710 P.2d 375]). Nevertheless, had the Legislature at any time desired to change the UCL so as to restrict its application to situations in which the predicate statute expressly provides for private action, it undeniably has had ample time to do so.

In urging us to reconsider our holding in *Children's Television*, Lucky relies heavily on our decisions in *Blatty* v. *New York Times Co.* (1986) 42 Cal.3d 1033 [232 Cal.Rptr. 542, 728 P.2d 1177], *Rubin* v. *Green, supra,* 4 Cal.4th 1187, and *Manufacturers Life Ins. Co.* v. *Superior Court, supra,* 10 Cal.4th 257 (*Manufacturers Life*). Together, Lucky suggests, these cases stand for the proposition that "a private litigant may not use the [UCL] to breathe new life into a cause of action the Legislature has denied it." Lucky's authorities are inapposite.

*Blatty* v. *New York Times, supra,* 42 Cal.3d 1033, involved an author's claims against a newspaper for failure to list his book on its "best seller" list. In *Blatty,* we did not discuss the UCL at all. We simply held that ". . . First Amendment limitations are applicable to all claims, of whatever label, whose gravamen is the alleged injurious falsehood of a statement . . . ." (*Blatty* v. *New York Times, supra,* 42 Cal.3d at pp. 1044-1045.) In so holding, we affirmed a judgment dismissing numerous claims with that gravamen, including one for "unfair competition." (*Id.* at p. 1038.) Unlike this case, *Blatty* v. *New York Times* did not present the question whether the absence of a private right of action to enforce the predicate statute compromises a plaintiff's eligibility to maintain a UCL cause of action.

Nor, contrary to Lucky's implication, did we hold in *Rubin* v. *Green, supra,* 4 Cal.4th 1187, that a UCL action is barred whenever the predicate

statute fails to provide the plaintiff with an independent cause of action. The plaintiff there, a mobilehome park owner, sought damages and equitable relief against a park resident and her attorneys for alleged wrongful solicitation of other park residents as clients for litigation against the plaintiff. (*Rubin* v. *Green, supra,* 4 Cal.4th at pp. 1191-1192.) We held only that "the unfair competition statute does not override the litigation privilege in this case . . . ." (*Id.* at p. 1204.) While so holding, we expressly noted that "the policy underlying the [UCL] can be vindicated by multiple parties other than plaintiff under the broad standing provision of . . . section 17204." (*Ibid.*) We regarded as "important" that "members of the public who, unlike plaintiff, are not adversaries in collateral litigation involving the same attorneys also have standing to pursue unfair competition claims under the statute." (*Ibid.*; see also *id.* at pp. 1204, 1205 (conc. and dis. opn. of Baxter, J.) [dissenting "to the extent [the majority opinion] precludes plaintiff's claim for injunctive relief" because, inter alia, "section 17204 makes clear that virtually any member of the public may seek *injunctive* relief from unlawful business practice." (Italics in original.)].)

Most importantly, neither *Blatty* v. *New York Times, supra,* 42 Cal.3d 1033, nor *Rubin* v. *Green, supra,* 4 Cal.4th 1187, focused on the question facing us. The outcome in those cases, rather, depended on overriding considerations not implicated here. In *Blatty* v. *New York Times,* we acted to prevent "creative pleading" from rendering nugatory the First Amendment limitations placed on litigation against speech. (42 Cal.3d at p. 1045.) In *Rubin* v. *Green,* as we later made plain, the specific bar we discerned to a UCL injunction was "the absolute bar to relief created by the litigation privilege." (*Manufacturers Life, supra,* 10 Cal.4th at p. 283 [discussing *Rubin* v. *Green*].)

In *Manufacturers Life,* also relied on by Lucky, we upheld the Court of Appeal's ruling that an unfair competition cause of action, based on conduct that violates both the Cartwright Act and the Unfair Insurance Practices Act (UIPA), is not barred by our holding in *Moradi-Shalal* v. *Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287 [250 Cal.Rptr. 116, 758 P.2d 58] (*Moradi-Shalal*) that the UIPA implies no private right of action. Lucky points to our statement in *Manufacturer's Life* that, in *Rubin* v. *Green,* in finding the plaintiff could not "plead around" the litigation privilege, we "analogized such pleading to the attempts [by other plaintiffs in other cases] to avoid the bar to 'implied' private causes of action under [the UIPA]" that we had recognized in *Moradi-Shalal* (see *Manufacturers Life, supra,* 10 Cal.4th at p. 283), and to our observation that several Courts of Appeal had held the bar to implied private causes of action under the UIPA "could not be avoided by characterizing the claim as one under the UC[L]" (*ibid.,* citing

*Safeco, supra,* 216 Cal.App.3d 1491; *Maler* v. *Superior Court* (1990) 220 Cal.App.3d 1592 [270 Cal.Rptr. 222]; *Industrial Indemnity Co.* v. *Superior Court* (1989) 209 Cal.App.3d 1093 [257 Cal.Rptr. 655]; *Lee* v. *Travelers Companies* (1988) 205 Cal.App.3d 691, 694-695 [252 Cal.Rptr. 468]; *Doctors' Co. Ins. Services* v. *Superior Court* (1990) 225 Cal.App.3d 1284, 1289 [275 Cal.Rptr. 674]; *American Internat. Group, Inc.* v. *Superior Court* (1991) 234 Cal.App.3d 749, 768 [285 Cal.Rptr. 765]).

 Neither from our discussion nor from the authorities we cited in *Manufacturers Life,* however, does it follow that a private plaintiff lacks UCL standing whenever the conduct alleged to constitute unfair competition violates a statute for the direct enforcement of which there is no private right of action. To the contrary, as noted, in *Manufacturer's Life* we permitted a UCL claim based on the Cartwright Act to go forward, even while recognizing that the conduct alleged as unfair competition also violated the UIPA, for the direct enforcement of which, following *Moradi-Shalal,* there is no private right of action. Because the UCL claim at issue in *Manufacturers Life* was not (as this UCL action is not) "based on conduct which is absolutely privileged or immunized by another statute" (*Manufacturer's Life, supra,* 10 Cal.4th at p. 284, citing Civ. Code, § 47, subd. (b)), we affirmed the Court of Appeal judgment overruling a demurrer to the claim (10 Cal.4th at p. 284).

In *Manufacturers Life,* moreover, we explained that *Moradi-Shalal* was not meant to impose sweeping limitations on private antitrust or unfair competition actions. In *Moradi-Shalal,* we stated, the court concluded "that the Legislature did not intend to create *new* causes of action when it described unlawful insurance business practices in [Insurance Code] section 790.03," but the court "did *not* hold that by identifying practices that are unlawful in the insurance industry . . . that violate the Cartwright Act, the Legislature intended to bar Cartwright Act causes of action based on those practices. Nothing in the UIPA would support such a conclusion. The UIPA nowhere reflects legislative intent to repeal the Cartwright Act insofar as it applies to the insurance industry, and the Legislature has clearly stated its intent that the remedies and penalties under the [UCL] are cumulative to other remedies and penalties." (*Manufacturers Life, supra,* 10 Cal.4th at p. 284, italics added, fn. omitted.)

The situation is similar here. Simply no basis exists for concluding that, by identifying and penalizing in Penal Code section 308 and the STAKE Act certain tobacco sales practices, the Legislature intended to bar unfair competition causes of action based on such practices. Section 308 and the STAKE Act nowhere reflect legislative intent to repeal other state statutes insofar as they may apply to tobacco retailers; in section 17205, on the other

hand, the Legislature has clearly stated its intent that the remedies and penalties under the UCL be cumulative to other remedies and penalties.

Citing *Safeco, supra,* 216 Cal.App.3d 1491, Lucky suggests that, in prosecuting this action, SYA is attempting to circumvent the absence of a private right of action under Penal Code section 308. Undeniably, section 308 provides for its own *direct* enforcement only by public lawyers. It does not follow, however, that a private UCL action that " ' "borrows" violations' " (*Farmers Insurance Exchange* v. *Superior Court, supra,* 2 Cal.4th at p. 383) of section 308 to establish predicate "unlawful" (§ 17200) business activity is barred. As relevant here, *Safeco* and similar cases on which Lucky relies, such as *Maler* v. *Superior Court, supra,* 220 Cal.App.3d 1592, and *Rubin* v. *Green, supra,* 4 Cal.4th 1187, stand at most for the proposition the UCL cannot be used to state a cause of action the gist of which is absolutely barred under some other principle of law. In *Safeco* and *Maler*, the concern was that "[t]o permit plaintiff to maintain [the UCL] action would render *Moradi-Shalal* meaningless" (*Safeco, supra,* 216 Cal.App.3d at p. 1494); in *Rubin* v. *Green*, the operative principle was the absolute privilege afforded litigation adversaries. Nothing in section 308, the STAKE Act or any other provision of law creates an analogous bar to this action.

Thus, contrary to Lucky's assertion, neither *Blatty* v. *New York Times, Rubin* v. *Green* nor *Manufacturers Life* (to the extent it embraced *Safeco* and its progeny's interpretation of *Moradi-Shalal*) implies a private UCL claim is barred whenever the predicate statute fails to afford a private right of action.

The Attorney General, representing the State of California as amicus curiae, suggests that construing section 17204 to confer standing on SYA would transform the criminal law into a body of civil law giving rise to private causes of action.[6] To some extent, the Attorney General impliedly mischaracterizes SYA's position. SYA does not contend a "private right of action" exists for it (or any other private plaintiff) to proceed under Penal Code section 308. SYA seeks relief from alleged unfair competition, not to enforce the Penal Code. As we previously have explained, " '[i]n essence, an action based on [the UCL] to redress an unlawful business practice "borrows" violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable

---

[6]We note a divergence of opinion on the question presented among public officers charged with enforcing the UCL. The CDAA, while not styling its brief as "in support of" either party, takes a substantive position parallel to SYA's. CDAA argues that private parties have standing to supplement public UCL enforcement, that UCL remedies are cumulative to others and that UCL remedies may redress penal violations.

under section 17200 et seq. and subject to the distinct remedies provided thereunder.'" (*Farmers Insurance Exchange* v. *Superior Court, supra,* 2 Cal.4th at p. 383.)

The Attorney General's suggestion is accurate only in the sense that violations of the Penal Code are, indisputably, "unlawful" (§ 17200) and, consequently, when committed as a "business act or practice" (*ibid.*), subject to UCL remediation in an action brought by "any person" (§ 17204). Recognition of that fact, however, "transforms" neither the criminal law nor the UCL.

Since their appearance in the early 1930's, California's unfair competition statutes have always expressly provided that, "in a case of . . . unfair competition" (Civ. Code, former § 3369, subd. (1)), civil actions "to enforce a penal law" (*ibid.*) "may be prosecuted by . . . any person" (*id.*, subd. (5)), as well as by public prosecutors. (See generally, Note, *Former Civil Code Section 3369: A Study In Judicial Interpretation* (1979) 30 Hastings L. J. 705, 706 (Note).) In fact, the modern UCL had its inception in the Legislature's expansion in 1933, to include unfair competition cases, of an *exception* (previously just for nuisance cases) to the long-standing principle that " '[n]either specific nor preventive relief can be granted [inter alia, to private parties] to enforce a penal law . . . .' " (Note, *supra*, 30 Hastings L.J. at p. 706, and fn. 5, quoting Civ. Code, former § 3369.)

In sum, Lucky and its supporting amici curiae fail to demonstrate the Court of Appeal erred in concluding that, pursuant to the plain language and legislative history of section 17204, and consistent with our previous pronouncements, SYA has standing to prosecute this UCL action.

### 2. *Legislative bar*

As previously discussed, in maintaining its right to prosecute this action, SYA relies on the Legislature's express provision that "[a]ctions for any relief pursuant to [the UCL] shall be prosecuted . . . by any person acting for the interests of itself, its members or the general public." (§ 17204.) Also as noted, in construing section 17204, "the courts have repeatedly permitted persons not personally aggrieved to bring suit for injunctive relief under the unfair competition statute on behalf of the general public, in order to enforce *other* statutes under which parties would otherwise lack standing." (*Consumers Union of the United States, Inc.* v. *Fisher Development, Inc., supra,* 208 Cal.App.3d at p. 1440, italics in original, citing *People* v. *McKale, supra,* 25 Cal.3d at p. 632.) Nevertheless, sometimes mischaracterizing its argument as one for preemption, Lucky contends the Legislature impliedly barred this

action[7] by not including in either Penal Code section 308 or the STAKE Act an express private right of enforcement; by enacting section 308, subdivision (e) (declaring "the Legislature's intent to regulate the subject matter of this section" and providing "no city, county, or city and county shall adopt any ordinance or regulation inconsistent with this section"); and by enacting section 308, subdivision (a) (providing that whosoever sells, gives or furnishes tobacco to a minor "is subject to either a criminal action for a misdemeanor or to a civil action brought by a city attorney, a county counsel, or a district attorney"). ▮ In short, Lucky contends the Legislature intended section 308 and the STAKE Act to comprise a comprehensive and exclusive scheme for combating the sale of tobacco to minors.

The doctrine of preemption applies, generally, when it is necessary to determine what displacing effect federal law, pursuant, inter alia, to the supremacy clause of the United States Constitution (*id.*, art. VI, cl. 2), may have on state laws (see generally, *Smiley v. Citibank* (1995) 11 Cal.4th 138, 147-148 [44 Cal.Rptr.2d 441, 900 P.2d 690]) or state law, pursuant, inter alia, to article XI, section 7 of the California Constitution, may have on local laws (see generally, *Sherwin-Williams Co. v. City of Los Angeles* (1993) 4 Cal.4th 893, 897-898 [16 Cal.Rptr.2d 215, 844 P.2d 534]). In substance, Lucky's argument is more akin to one of implied repeal. ▮ While, like the preemption doctrine, the doctrine of implied repeal reflects the primacy of legislative intent (see generally, *English v. General Electric Co.* (1990) 496 U.S. 72, 79 [110 S.Ct. 2270, 2275, 110 L.Ed.2d 65]; *Droeger v. Friedman, Sloan & Ross* (1991) 54 Cal.3d 26, 43 [283 Cal.Rptr. 584, 812 P.2d 931]), the implied repeal doctrine applies "[w]hen two or more statutes [enacted by the same legislature] concern the same subject matter and are in irreconcilable conflict . . . ." (*In re Thierry S.* (1977) 19 Cal.3d 727, 744 [139 Cal.Rptr. 708, 566 P.2d 610].) In such cases, "the doctrine of implied repeal provides that the most recently enacted statute expresses the will of the Legislature, and thus to the extent of the conflict impliedly repeals the earlier enactment." (*Ibid.*)[8]

▮ Lucky acknowledges it is not asserting principles of federal preemption, but insists the Legislature had "preemptive intent" when enacting

---

[7]Lucky's counsel at oral argument went so far as to suggest that Penal Code section 308 "expressly" bars private standing to maintain UCL actions based on section 308. In fact, neither section 308 nor the STAKE Act contains any express reference to the UCL or to unfair competition. Section 308 provides that whosoever sells, gives or furnishes tobacco to a minor "is subject to either a criminal action for a misdemeanor or to a civil action brought by a city attorney, a county counsel, or a district attorney" (§ 308, subd. (a)), but, conspicuously, does *not* state that such persons are subject only to such actions or that such persons are not subject to actions under other applicable statutes.

[8]The prohibition on furnishing tobacco to minors was added to the Penal Code in 1891. (Historical Note, 48 West's Ann. Pen. Code (1988 ed.) foll. § 308, p. 388.) As noted, the

Penal Code section 308. Of course, our concern is the soundness of Lucky's argument, not its characterization. Nonetheless, for the sake of clarity, we should recognize that, when arguing that the "remedies [of the UCL] are not available to private parties if the Legislature denied private enforcement rights when it established the appropriate enforcement scheme for the underlying law [i.e., by supplementing, in 1992, section 308 with the STAKE Act]," Lucky in substance posits the partial *implied repeal* of the UCL's broad express standing provision, not its "preemption." (See *Western Oil & Gas Assn.* v. *Monterey Bay Unified Air Pollution Control Dist.* (1989) 49 Cal.3d 408, 417 [261 Cal.Rptr. 384, 777 P.2d 157].)

■ The governing principles in determining whether a statute repeals another by implication are well established. (*People* v. *Hazelton* (1996) 14 Cal.4th 101, 122 [58 Cal.Rptr.2d 443, 926 P.2d 423].) The law shuns repeals by implication. (*Ibid.*) In fact, " '[t]he presumption against implied repeal is so strong that, "To overcome the presumption the two acts must be irreconcilable, clearly repugnant, and so inconsistent that the two cannot have concurrent operation. The courts are bound, if possible, to maintain the integrity of both statutes if the two may stand together." ' " (*Ibid.*, quoting *Western Oil & Gas Assn.* v. *Monterey Bay Unified Air Pollution Control Dist.*, *supra*, 49 Cal.3d at pp. 419-420.)

■ According to Lucky, the Legislature's failure, when amending the UCL in 1992, to take any action expressly to contravene the *Safeco* line of decisions (concerning UCL actions premised on the UIPA) constitutes its ratification of the principle that a valid private UCL action cannot be predicated on a defendant's violation of a statute for the direct enforcement of which there is no private right of action. As previously explained (*ante*, pp. 565-566), however, the *Safeco* line of decisions stands for no such sweeping principle. In any event, the history of the UCL's enactment and amendment suggests the Legislature understands and accepts the breadth inherent in the UCL as we have construed it.

The precursor to the UCL was former Civil Code section 3369, which originally read: " 'Neither specific nor preventive relief can be granted to

modern UCL first appeared, in 1933, as an amendment to former Civil Code section 3369. (See Note, *supra*, 30 Hastings L.J. at p. 706, and fn. 5.) The STAKE Act was enacted in 1994. (Stats. 1994, ch. 1009.) Thus, to the extent Lucky relies on the STAKE Act, whether alone or with respect to its effect when combined with that of Penal Code section 308 (but not, strictly speaking, to the extent Lucky relies on section 308 alone), Lucky's argument follows the contours of implied repeal. (See *In re Thierry S.*, *supra*, 19 Cal.3d at p. 744.) At oral argument, Lucky's counsel characterized the argument as one of "harmonization" rather than implied repeal. The same general rules of construction apply regardless of which characterization is adopted. "Whenever possible . . . we must reconcile statutes and seek to avoid interpretations which would require us to ignore one statute or the other . . . ." (*Fuentes* v. *Workers' Comp. Appeals Bd.* (1976) 16 Cal.3d 1, 7 [128 Cal.Rptr. 673, 547 P.2d 449].)

enforce a penal law, except in a case of nuisance, nor to enforce a penalty or forfeiture in any case.' " (Note, *supra*, 30 Hastings L.J. at p. 706, fn. 5.) In 1933, the Legislature created the modern UCL by expanding section 3369's exception for nuisance cases to include unfair competition cases. The 1933 amendment to the statute provided injunctive relief from unfair competition and defined "unfair competition" to include "unfair or fraudulent business practice" as well as false advertising. (Note, *supra*, 30 Hastings L.J. at p. 706.) The amendment expressly authorized the attorney general, district attorneys and private individuals to seek injunctive relief and defined "person" very broadly, "so as to include virtually any combination of persons." (*Id.* at pp. 706-707.) In 1963, the Legislature further broadened section 3369 by adding the word "unlawful" to the types of wrongful business conduct that could be enjoined as unfair competition. (*Barquis* v. *Merchants Collection Assn., supra,* 7 Cal.3d at p. 112.)

In 1977, the Legislature moved the UCL to section 17200 et seq. of the Business and Professions Code, "a move not intended to alter it substantively nor to affect the applicability of pre-existing interpretive case law." (Fellmeth, *California's Unfair Competition Act: Conundrums and Confusions* (Jan. 1995), published as part of Recommendation on Unfair Competition Litigation (Nov. 1996) 26 Cal. Law Revision Com. Rep. (1996) p. 232, fns. omitted.) The UCL now appears between the similarly titled Unfair Practices Act beginning at section 17000, which is roughly analogous to the federal Clayton Act (e.g., prohibiting predatory below cost and price discrimination offenses), and section 17500, which prohibits deceptive advertising. (*Ibid.*)

More recently, in 1992, the Legislature amended section 17200 to expand the definition of unfair competition to include "*any* unlawful, unfair, or fraudulent business *act or* practice" (See Stats. 1992, ch. 430, § 2, p. 1707 [inserting italicized language]) and amended section 17203 to expand the scope of injunctive relief to encompass past activity and out-of-state activity. (See Stats. 1992, ch. 430, § 3, p. 1707 [replacing "person performing or proposing to perform an act of unfair competition within this state" with "person who engages, has engaged, or proposes to engage in unfair competition"].) The 1992 amendments overruled former case law that had limited the statute's application. (See *State of California* ex rel. *Vande Kamp* v. *Texaco, Inc.* (1988) 46 Cal.3d 1147, 1169-1170 [252 Cal.Rptr. 221, 762 P.2d 385] [UCL's " 'practice' requirement envisions something more than a single transaction"].)

As the foregoing demonstrates, whenever the Legislature has acted to amend the UCL, it has done so only to *expand* its scope, never to narrow it. Consistently, just last term, the Legislature rejected several pieces of proposed legislation designed to restrict UCL standing in various ways. (See

Dresslar, *Effort to Limit Consumer Suits Appears at Impasse*, S. F. Daily Journal (May 16, 1997) p. 1.)[9]

Moreover, contrary to Lucky's contention, the Legislature's enactment of the STAKE Act belies, rather than supports, the notion that it meant Penal Code section 308 to be the exclusive means in California of combating sales of tobacco to minors. The STAKE Act requires the Department of Health Services (DHS), inter alia, to "[e]stablish and develop a program to reduce the availability of tobacco products to persons under 18 years of age through the enforcement activities" (§ 22952, subd. (a)) therein described, including "random, onsite sting inspections at retail sites" (*id.*, subd. (c)). The Legislature's requirement of DHS "enforcement activities" in the STAKE Act plainly indicates it does *not* intend section 308 to be an exclusive device.

As SYA points out, Lucky in its briefing treats the STAKE Act as if its effect were to make DHS an additional public enforcer of Penal Code section 308. But section 308 makes *no* reference to DHS and DHS has no power under the STAKE Act (or any other statute) directly to enforce section 308. Thus, by their own terms, section 308 and the STAKE Act simply coexist, but *not* because either statute incorporates the other. Rather, the two enactments coexist because conduct "subject to either a criminal action . . . or to a civil action" (§ 308, subd. (a)) under section 308 is also subject to other, cumulative state laws, including the STAKE Act.

Lucky cites *Bravo Vending* v. *City of Rancho Mirage* (1993) 16 Cal.App.4th 383, 403 [20 Cal.Rptr.2d 164] (*Bravo Vending*) for the proposition that "the regulatory field preempted by section 308 is that of the penal—i.e., both criminally and civilly proscribed—aspects of the sale of cigarettes to minors." (*Ibid.*) At issue in *Bravo Vending* was whether Penal Code section 308 preempts a city ordinance that banned vending machine sale of cigarettes. While it may be that "the Legislature intended to preempt all local government regulation of the subject matter of section 308" (*Bravo Vending, supra,* 16 Cal.App.4th at p. 400), such would have no necessary consequence for our purposes, as neither the UCL nor this action is "local government regulation," and preemption is not an issue. Moreover, to the extent *Bravo Vending* is relevant, it aids SYA, not Lucky. That the Legislature meant section 308 to be the exclusive means of combating sales of

---

[9]Just prior to oral argument, plaintiff requested judicial notice of Assembly Bill No. 1394 (1997-1998 Reg. Sess.) (expanding exemptions to Fair Packaging and Labeling Act "slack fill" restrictions; signed into law Oct. 5, 1997) and Assembly Bill No. 1295 (1997-1998 Reg. Sess.) (bill to enact requirements for persons requesting UCL monetary remedies; re-referred to committee May 20, 1997). Simple citations to such published materials would have sufficed (see *Mangini* v. *R.J. Reynolds Tobacco Co., supra,* 7 Cal.4th at p. 1064); nevertheless, as relevant to our observation the Legislature has rejected recent proposals to restrict UCL standing, we grant plaintiff's request. (Evid. Code, § 452, subd. (c) ["[o]fficial acts"].)

tobacco to minors is belied by its failure to preempt local legislation like the vending machine ban the court in *Bravo Vending* held "does not intrude into the field of regulation occupied by section 308" (*Bravo Vending, supra,* 16 Cal.App.4th at p. 413).

Nor can the notion of Penal Code section 308's exclusivity be reconciled with the Legislature's enactment of restrictions on tobacco promotion such as the tobacco use prevention provisions, Health and Safety Code section 104350 et seq., and Health and Safety Code section 118950, subdivision (b), which bans giving free cigarette samples on public sidewalks and in other locations.

Plainly, the mere fact the Legislature has enacted penal laws concerning minors and tobacco does not impliedly repeal any UCL remedy. "Notwithstanding Section 3369 of the Civil Code [providing that "[n]either specific nor preventive relief can be granted to enforce a penalty or forfeiture in any case, nor to enforce a penal law, except in the case of nuisance or as otherwise provided by law"], specific or preventive relief may be granted to enforce a penalty, forfeiture, or penal law in a case of unfair competition." (§ 17202.) The UCL affords both "specific" and "preventive" relief, restitution being an example of the former (see Civ. Code, § 3367) and an injunction an example of the latter (*id.,* § 3368).

Nor does the Legislature's failure *expressly* to preserve any UCL remedy when enacting Penal Code section 308 or the STAKE Act impliedly repeal any part or aspect of the UCL. "The omission to specify or affirm in [the Penal] Code any liability to damages, penalty, forfeiture, or other remedy imposed by law and allowed to be recovered or enforced in any civil action or proceeding, for any act or omission declared punishable herein, does not affect any right to recover or enforce same." (Pen. Code, § 9.)

It is undisputed that "[c]ivil actions lie in favor of crime victims. Violation of a criminal statute embodying a public policy is generally actionable even though no specific civil remedy is provided in the criminal statute." (*Angie M.* v. *Superior Court* (1995) 37 Cal.App.4th 1217, 1224 [44 Cal.Rptr.2d 197].) We have recognized, moreover, that "even though a specific statutory enforcement scheme exists, a parallel action for unfair competition is proper pursuant to applicable provisions of the Business and Professions Code." (*People* v. *McKale, supra,* 25 Cal.3d at p. 632; see, e.g., *Samura* v. *Kaiser Foundation Health Plan, Inc.* (1993) 17 Cal.App.4th 1284, 1299, fn. 6 [22 Cal.Rptr.2d 20] [recognizing right of private plaintiff to sue to enjoin acts made unlawful by the Knox-Keene [HMO licensing] Act]; *Children's Television, supra,* 35 Cal.3d at pp. 210-211 [unfair competition action available

to remedy cereal adulteration and misbranding, despite existence of criminal penalties under Sherman Law]; *Rubin* v. *Green, supra,* 4 Cal.4th at p. 1204 [unfair competition action proper to remedy improper solicitation of litigation clients, notwithstanding existence of "additional sanctions against attorney solicitation" available to "the State Bar and prosecutorial authorities"].)

The unfair competition law, moreover, states that "[u]nless otherwise *expressly* provided, the remedies or penalties provided by this chapter [i.e., ch. 5, Enforcement, Bus. & Prof. Code, §§ 17200-17209] are cumulative to each other and to the remedies or penalties available under all other laws of this state." (§ 17205, italics added.) Thus, even were we to conclude (contrary to our previous discussion) that Penal Code section 308 and the STAKE Act are a comprehensive scheme for combating teen smoking, we would still confront the fact that in neither of these provisions is it "expressly provided" that remedies under the UCL and those statutes are not cumulative to each other.

■ The term " 'expressly' means 'in an express manner; in direct or unmistakable terms; explicitly; definitely; directly.' " (*City & County of San Francisco* v. *Western Air Lines, Inc.* (1962) 204 Cal.App.2d 105, 120 [22 Cal.Rptr. 216]; accord, Webster's New Internat. Dict. (3d ed. 1981) p. 803.) We agree with amicus curiae CDAA that, in order to conclude an enforcement "scheme" comprising Penal Code section 308 and the STAKE Act *impliedly* repeals the UCL's broad express standing provision, we would have to read the word "implicitly" into section 17205 or read the word "expressly" out of it. ■ Our office, of course, "is simply to ascertain and declare" what is in the relevant statutes, "not to insert what has been omitted, or to omit what has been inserted." (Code Civ. Proc., § 1858.) We are not authorized to insert qualifying provisions not included, and may not rewrite the statute to conform to an assumed intention which does not appear from its language. (*Napa Valley Wine Train, Inc.* v. *Public Utilities Com.* (1990) 50 Cal.3d 370, 381 [267 Cal.Rptr. 569, 787 P.2d 976].)

■ As neither Penal Code section 308 nor the STAKE Act expressly provides otherwise, we conclude the remedies or penalties provided by the UCL are cumulative to the remedies or penalties available under those statutes.

Our conclusion is reinforced by the observation that, when the Legislature has desired to limit UCL remedies, it has "expressly provided" (§ 17205) for such limitation. For example, the Rosenthal-Roberti Item Pricing Act provides that its remedies "are the exclusive remedies available to any person, state or local agency or law enforcement official." (Civ. Code, § 7104.)

Penal Code section 186.11, which provides penalties for patterns of related felony conduct involving fraud or embezzlement, states that "two separate actions against the same defendant and pertaining to the same fraudulent or unlawful acts may not be brought . . . pursuant to this section and Chapter 5 (commencing with Section 17200) of Part 2 of Division 7 of the Business and Professions Code [i.e., the UCL]." (*Id.*, subd. (*l*).) Similarly, the California Residential Mortgage Lending Act forbids penalties and fines thereunder "if a licensee demonstrates that it has paid a civil monetary penalty or fine for the same act or transaction, as a violation of Section 17200 or 17500 of the Business and Professions Code . . . ." (Fin. Code, § 50510; see also Health & Saf. Code, § 42400.6 [providing "[a] fine or monetary penalty specified . . . may be collected either under [certain] provisions of this code, or under that chapter [i.e., the UCL] of the Business and Professions Code, but not under both."]) Neither Penal Code section 308 nor the STAKE Act contains a similar express limitation on UCL remedies.

We need not decide in this case whether section 17205's statement that UCL remedies are cumulative to others "unless expressly otherwise provided" necessarily precludes the Legislature from ever impliedly repealing any aspect of UCL standing. For present purposes, we merely conclude Lucky has not overcome, in this case, the strong presumption against implied repeal (*Western Oil & Gas Assn.* v. *Monterey Bay Unified Air Pollution Control Dist., supra,* 49 Cal.3d at p. 419) of the UCL. That is, Lucky fails to demonstrate that Penal Code section 308, even when considered in light of the STAKE Act, is "irreconcilable" (*People* v. *Hazelton, supra,* 14 Cal.4th at p. 122) with the UCL's broad express standing provision. Still less has Lucky shown that, either alone or in light of the STAKE Act, section 308 and the UCL are " ' "clearly repugnant, and so inconsistent that the two cannot have concurrent operation." ' " (14 Cal.4th at p. 122.)

### 3. *Policy*

 Lucky argues a private UCL action predicated on Penal Code section 308 threatens to put the public prosecutor's discretionary decision-making within the influence or control of an interested party. Lucky cites *People* v. *Eubanks* (1996) 14 Cal.4th 580, 599 [59 Cal.Rptr.2d 200, 927 P.2d 310], but *Eubanks*, involving private financial contributions to a public prosecution, is not apposite. The UCL does not diminish any public prosecutor's powers or prerogatives under section 308 or alter DHS authority and responsibility under the STAKE Act.[10] Lucky cannot explain how either party's actions with respect to this lawsuit could in any way interfere with public prosecutors proceeding under section 308 or with the DHS's "primary

---

[10] In fact, the UCL to some extent actually enhances the Attorney General's ambit of operation; he or she may intervene in a private UCL action like this one, in order to pursue the

responsibility for enforcement" (§ 22952, subd. (c)) of the STAKE Act. SYA, a private plaintiff, simply has *no* involvement in any criminal prosecution.

Lucky suggests this action creates the "offensive" possibility that a prosecutor would reap an inappropriate financial benefit, but SYA has no affiliation with any governmental agency and, in any event, requests that "defendants jointly and severally pay restitution *to the State of California,*" not to SYA.[11] SYA also seeks its costs, "including a reasonable attorney fee." Lucky alludes to allegations that SYA is making use of the UCL as a cynical means of generating attorney fees. For its part, SYA alleges it brings this action in the public interest and insists its corporate status is simply a symbolic statement of willingness to "work diligently to accomplish a result" and that it does not expect to make a profit. Where the truth lies as to these matters is not an issue on review before this court.

Trial courts, of course, are empowered to inquire into the bona fides of private lawsuits, including this or any private UCL action. Code of Civil Procedure section 128.7 provides that the filing of a pleading certifies that, to the attorney or unrepresented party's "knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the pleading is not being presented "primarily for an improper purpose," the claims, defenses and other legal contentions therein are "warranted," and the allegations and other factual contentions "have evidentiary support." (*Id.*, subd. (b).) If these standards are violated, the court can impose an appropriate sanction sufficient to deter future misconduct, including a monetary sanction. (*Id.*, subds. (c), (d).) Further, under Code of Civil Procedure section 1021.5, whether or not plaintiff's counsel is entitled to any attorney fees and,

section 17206 penalties available only to government plaintiffs (or for any other reason). A private plaintiff's remedial ambit is, by comparison, limited. If the Attorney General chooses not to intervene and seek section 17206 penalties, a private plaintiff obviously cannot recast a private UCL action so as to implicate them.

[11]We previously have observed: " '[T]he laws against unfair business practices were drafted in large part to prevent a wrongdoer from retaining the benefits of its illegal acts.' " (*ABC Internat. Traders, Inc.* v. *Matsushita Electric Corp., supra,* 14 Cal.4th at p. 1270.) Under the UCL, a court may "restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition." (§ 17203.) SYA's complaint includes a request for "restitution" to be paid to the State of California. Lucky emphasizes the size of SYA's request; SYA "concedes that its estimate of restitution contained in its prayer is erroneous, and if given the opportunity will amend that prayer to omit any statement as to amount of restitution." SYA has not named the state as a party, nor has Lucky complained of the omission. As noted, the state appears before us as amicus curiae. We express no opinion on the appropriateness of SYA's prayer for "restitution" to be paid to the state. The cause comes before us at the demurrer stage and "a demurrer tests the sufficiency of the factual allegations of the complaint rather than the relief suggested in the prayer of the complaint." (*Venice Town Council, Inc.* v. *City of Los Angeles* (1996) 47 Cal.App.4th 1547, 1562 [55 Cal.Rptr.2d 465].)

if so, what constitutes a "reasonable" fee, depends entirely upon whether SYA ultimately is, by the trial court in the first instance, adjudged "a successful party in an action resulting in the enforcement of an important right affecting the public interest." (See generally, *Hewlett* v. *Squaw Valley Ski Corp.* (1997) 54 Cal.App.4th 499 [63 Cal.Rptr.2d 118].) Any incentive to file inappropriate cases solely to obtain attorney fees presumably may be minimized by strictly applying the standards of that section and section 128.7.

Most fundamentally, as previously discussed, SYA is not suing under, or to enforce, Penal Code section 308 or the STAKE Act. Rather, SYA seeks to enforce *the UCL* by means of restitution and an injunction[12] forbidding Lucky to continue selling cigarettes to children. Enforcing the UCL in this manner, SYA impliedly contends, would advance the policy of discouraging unfair competition by leveling the playing field on which Lucky competes with other, law-abiding, retailers. As we have stated, the UCL embodies "the policy of permitting members of the public to police the spectrum of 'unfair competition.'" (*Rubin* v. *Green, supra,* 4 Cal.4th at p. 1201.) Without regard to whether (or to what degree) SYA's action, as a factual matter, advances such worthwhile ends, we agree with SYA the fact a UCL action is based upon, or may even promote the achievement of, policy ends underlying section 308 or the STAKE Act, does not, of itself, transform the action into one for the "enforcement" of section 308.

Amicus curiae the State of California warns that our permitting SYA to predicate its UCL action on Penal Code section 308 will encourage "vigilante justice." More generally, Lucky suggests public confidence in the judicial system will be undermined if private plaintiffs are permitted to maintain UCL actions predicated on violations of the Penal Code. Citing *People* ex rel. *Clancy* v. *Superior Court* (1985) 39 Cal.3d 740 [218 Cal.Rptr. 24, 705 P.2d 347] (invalidating a contingent fee for a city nuisance-abatement lawyer), Lucky argues that public confidence in the judicial system will be strained if what Lucky characterizes as "private bounty hunters" are permitted to bring UCL actions based on violation of section 308. Lucky asserts that the "essential neutrality" that engenders public confidence in prosecutors is missing when a partisan advocate, seeking a client's (rather than the public's) best interest, relies upon a penal statute.

In this connection, Lucky and supporting amici curiae assert that SYA, in order to gather evidence for maintenance of this suit, hired minors to

---

[12]As the issue is not before us on demurrer, we need not decide whether, on remand, if SYA proves to the fact finder's satisfaction the elements of its UCL cause of action, it may or may not qualify, in light of all relevant considerations, for an actual award of injunctive relief.

purchase cigarettes in violation of Penal Code section 308, subdivision (b). Questioned at oral argument, plaintiff's counsel acknowledged no illegality and asserted various private organizations concerned about minors' tobacco use have conducted tobacco purchase "sting" operations, sometimes supplying the results to law enforcement agencies. Amicus curiae State of California, however, expresses general concern that we not validate "sting" actions conducted under other than STAKE Act auspices.

Even assuming the truth of Lucky's allegations respecting SYA's prelitigation practices, it does not follow that our recognizing the viability of this UCL action—at the demurrer stage—would place an imprimatur on illegal practices. Our previous pronouncements make plain a private party has no privilege or immunity to employ illegal means to obtain evidence for a lawsuit. (See *Kimmel* v. *Goland* (1990) 51 Cal.3d 202, 212 [271 Cal.Rptr. 191, 793 P.2d 524].) It need hardly be noted that illegal "sting" operations are not inherent to private UCL actions and our countenancing the latter in no way endorses the former.

Lucky also argues that, because the UCL has broad standing and remedial provisions, the operation of which may impact the California business climate, this court should exercise restraint in considering whether to construe the UCL as supporting a private unfair competition action predicated on violation of section 308. We are not persuaded. ▮▮▮ "As this court said 59 years ago, in rejecting a constitutional challenge to the [Unfair Practices Act], '[i]t is not for the courts, except within the limits herein set forth, to determine whether or not the policy of a statute is economically sound or beneficial. That is a matter solely for the legislature.'" (*ABC Internat. Traders, Inc.* v. *Matsushita Electric Corp.*, *supra*, 14 Cal.4th at p. 1263, quoting *Wholesale T. Dealers* v. *National etc. Co.* (1938) 11 Cal.2d 634, 646-647 [82 P.2d 3, 118 A.L.R. 486].)[13]

Lucky may be correct in observing the UCL is broadly cast. Lucky asserts the UCL has lax standing provisions, lacks res judicata effect and carries the

---

[13]Amicus curiae the California Chamber of Commerce (CCC) requests we judicially notice a 1992 publication of the Council on California Competitiveness, but makes no attempt to relate that publication to any issue properly before us. As "'[m]atters otherwise subject to judicial notice must be relevant to an issue in the action'" (*Mangini* v. *R.J. Reynolds Tobacco Co.*, *supra*, 7 Cal.4th at p. 1062, quoting 2 Jefferson, Cal. Evidence Benchbook, *supra*, § 47.1, p. 1749), we decline this portion of CCC's request. CCC further requests we judicially notice: (1) a 1995 background study of the UCL commissioned by the California Law Revision Commission; (2) section 874A, comment (h) of the Restatement Second of Torts; and (3) a 1996 report of the Commerce Committee of the United States Senate concerning the Fair Packaging and Labeling Act. Although simple citations to such readily available published materials would have sufficed, to the extent they contain relevant materials we grant these portions of CCC's request. (Evid. Code, § 452, subd. (c) ["[o]fficial acts"]; see *Mangini* v. *R.J. Reynolds Tobacco Co.*, *supra*, 7 Cal.4th at p. 1064.) Finally, CCC requests we judicially notice, as examples of potential conflict between the UCL and federal law, a superseded

potential for multiple, repetitive suits. Lucky's concerns here are best addressed to the Legislature. Generally, it is not within our province to judge the fundamental wisdom of the UCL's overall scheme.

As this court has often recognized, " 'the judicial role in a democratic society is fundamentally to interpret laws, not to write them. The latter power belongs primarily to the people and the political branches of government . . . .' " (*California Teachers Assn.* v. *Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 633 [59 Cal.Rptr.2d 671, 927 P.2d 1175], quoting *Kopp* v. *Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 675 [47 Cal.Rptr.2d 108, 905 P.2d 1248].) "It cannot be too often repeated that due respect for the political branches of our government requires us to interpret the laws in accordance with the expressed intention of the Legislature. 'This court has no power to rewrite the statute so as to make it conform to a presumed intention which is not expressed.' " (14 Cal.4th at p. 633, quoting *Seaboard Acceptance Corp.* v. *Shay* (1931) 214 Cal. 361, 365 [5 P.2d 882].) ▮ Accordingly, we decline Lucky's invitation judicially to categorize potential plaintiffs as qualified or unqualified to maintain UCL claims on behalf of the general public. The Legislature has expressly provided that "any person" (§ 17204) may maintain such a suit, and—it need hardly be noted—should the Legislature disagree with our conclusion here, it remains free to provide otherwise.

### DISPOSITION

For the preceding reasons, the judgment of the Court of Appeal is affirmed.

George, C. J., Mosk, J., Baxter, J., Kennard, J., and Cottle, J.,* concurred.

**BAXTER, J.,** Concurring.—Although I have serious reservations as to the ultimate viability of this lawsuit, I concur in the judgment and the reasoning underlying the conclusion that plaintiff has standing to prosecute this lawsuit. My concerns regarding this possible misuse of the Unfair Competition

---

Court of Appeal opinion discussing questions of UCL standing, and the petition for review in another case, *Sampson* v. *Combe* (Cal.App.) S056464 (rev. denied Nov. 20, 1996). Our review of the Court of Appeal's decision in this action does not implicate any question related to the supremacy of federal law, but as the requested items are already part of our files, we grant this portion of CCC's request. (Evid. Code, § 452, subd. (d).)

*Presiding Justice of the Court of Appeal, Sixth District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Law (Bus. & Prof. Code, § 17200 et seq.)[1] (UCL), most of which are identified in the majority opinion, cannot be resolved in the procedural posture in which this case reaches us. On the narrow issue before us, whether the complaint states a cause of action under the UCL, I agree with the majority. It does.

The UCL authorizes "any person," which includes corporate entities, to bring an action on that person's own behalf or in the interests of the public, to seek both redress for a past act or acts of unfair competition and an injunction against future unfair competition. (§§ 17201, 17203.) An unlawful act in the business context is, by definition, an action of unfair competition. (§ 17200.) Penal Code section 308 makes the knowing sale of tobacco products to minors unlawful. The complaint alleged that Lucky Stores, Inc., sold tobacco products to minors.

The Legislature has declared that "[u]nless otherwise expressly provided," UCL remedies are cumulative to remedies and penalties available "under all other laws of this state." (§ 17205.) Nothing in the later enacted Stop Tobacco Access to Kids Enforcement Act (§ 22950 et seq.; (STAKE Act)) suggests, let alone "expressly provide[s]," a legislative intent to limit the scope or availability of the UCL insofar as the unlawful sale of tobacco products is concerned. There is neither an express nor an implied pro tanto repeal of the UCL in the STAKE Act or in Penal Code section 308. The STAKE Act and Penal Code section 308 reflect legislative awareness of the grave health risks posed by use of tobacco products. Through them the Legislature has created means by which governmental officers attempt to prevent use of, and consequent addiction to, tobacco by persons under the age of 18, and penalize those who sell tobacco products to them. The UCL serves a completely different purpose. It provides remedies for and protection against unlawful business practices because those practices constitute unfair competition.

Merchants who violate the law by selling tobacco products to minors obtain an unfair competitive advantage over their law-abiding counterparts who do not share in the profits from such illegal sales. Use of the UCL to restrain such unlawful activity is therefore appropriate notwithstanding the existence of sanctions available under the criminal law. Compelled disgorgement of profits earned by unlawful sales deters future violations of the law and levels the playing field on which the business activity occurs. (*Fletcher* v. *Security Pacific National Bank* (1979) 23 Cal.3d 442, 451 [153 Cal.Rptr. 28, 591 P.2d 51] [construing identical language in section 17535 applicable

---

[1] Unless otherwise specified, all statutory references are to the Business and Professions Code.

to false and misleading advertising].) Injunctions against future violations do the same. This is true regardless of whether the unfair business activity involves violation of a criminal law. Because the UCL authorizes "any person acting for the interests of itself, its members or the general public" (§ 17204), to prosecute actions for relief under the UCL, and it cannot be determined at the demurrer stage of this litigation what, if any, relief plaintiff should receive, I concur in the majority opinion.

I write separately, however, to emphasize that in subsequent stages of this litigation the defendant may again raise the issues we do not reach today and the trial court may conclude that this plaintiff should not be awarded the relief sought—damages or restitution and injunctive relief.

A demurrer reaches only objections to the sufficiency of a complaint which appear on the face of the complaint or are based on matter of which the court must take judicial notice. (Code Civ. Proc., § 430.30.) As the majority notes, the prayer for relief in a complaint is not subject to demurrer. If the allegations of the complaint suggest that the plaintiff is entitled to any relief, a demurrer asserting that the complaint fails to state a cause of action must be overruled even if the complaint seeks a type of relief to which the plaintiff is not entitled. (*Colvig* v. *RKO General, Inc.* (1965) 232 Cal.App.2d 56, 66 [42 Cal.Rptr. 473]; see also *Franchise Tax Board* v. *Firestone Tire & Rubber Co.* (1978) 87 Cal.App.3d 878, 885 [151 Cal.Rptr. 460].) Since the complaint alleges unlawful sales of tobacco products to minors, plaintiff may be entitled to injunctive relief. Since injunctive relief is an equitable remedy, however, whether to grant that relief lies in the sound discretion of the trial court. If, as claimed, plaintiff or its counsel has engaged in improper or unlawful conduct in gathering evidence, such as its alleged statutorily unauthorized use of underage decoys,[2] or has initiated the action for reasons other than redressing unfair business practices, or has engaged in extortionate conduct in initiating and/or prosecuting the action, the trial court may well determine that equitable relief should be denied. (*Allen* v. *Los Angeles County District Council of Carpenters* (1959) 51 Cal.2d 805, 811-812 [337 P.2d 457]; *Garamendi* v. *Mission Ins. Co.* (1993) 15 Cal.App.4th 1277, 1289 [19 Cal.Rptr.2d 190].)

---

[2]A person under 18 years of age who purchases tobacco products violates Penal Code section 308, subdivision (b). Thus a person who makes unauthorized use of minor decoys in a private "sting" operation may violate that law as a conspirator or aider and abettor of the purchase, and may violate Penal Code section 272 by contributing to the delinquency of the minor. The STAKE Act authorizes the State Department of Health Services and local law enforcement agencies, pursuant to department guidelines and subject to strict statutory conditions, to carry out random, on-site sting operations using 14- and 15-year-old decoys whose participation then is not a violation of Penal Code section 308. (§ 22952, subds. (c) and (d).) No similar statutory authority permits private persons to engage minors in the purchase of tobacco products for purposes of establishing unfair competition.

The trial court may also determine that the prosecution of this suit, which is not supported by the Attorney General or by local prosecutors, may interfere with the ability of those officers to enforce remedies available to governmental agencies. Defendants who find themselves exposed to repetitive suits and overlapping remedial orders under private UCL judgments and governmental actions to enforce the STAKE Act and/or Penal Code section 308 may well be less willing to enter into consent decrees with the governmental agencies.

Of equal concern, however, is the monetary relief sought by plaintiff. It is unclear from the complaint whether plaintiff seeks restitution, a remedy provided for by the UCL, or damages, a remedy not authorized by that law. "[D]amages are not available under section 17203. [Citations.] The only nonpunitive monetary relief available under the Unfair Business Practices Act is the disgorgement of money that has been wrongfully obtained or, in the language of the statute, an order 'restor[ing] . . . money . . . which may have been acquired by means of . . . unfair competition.' (§ 17203; cf. §§ 17206, 17207 [penalties].)" (*Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1266 [10 Cal.Rptr.2d 538, 833 P.2d 545].)

To the extent that plaintiff seeks a monetary remedy, it is in the prayer for $10 billion to be paid to the State of California. "Restore" and "restitution" have a well understood meaning. "Restore" means "return" and "restitution" is the act of returning the thing which is restored. Section 17203 authorizes the court to make orders as "necessary to restore to any person in interest any money or property" gained through unfair business competition. If we are faithful to language of section 17203 and the purpose of the UCL, therefore, the restitution authorized by the UCL is a return of the profit earned from an unfair business practice to the person who was the victim of that unlawful practice. That person might be a business competitor or a consumer. It is far from clear that the sum sought by plaintiff reflects an estimate of the profits Lucky Stores, Inc., and other defendants who were also named, but are no longer parties made from unlawful sales of tobacco products to minors. The allegations of the complaint suggest that plaintiff actually seeks damages.

The complaint alleges that the sale of cigarettes to minors, or to adults who became addicted as minors as a result of such sales, costs the State of California more than one dollar in health care costs for each dollar defendant obtained through the sales. On that basis it also alleges that these health care costs have cost the state an amount exceeding 90 percent of defendant's gross profits from cigarette sales. The prayer that the defendant pay $10 billion "restitution" to the State of California therefore appears to be a claim

for costs incurred as a result of the need to provide remedial health care for tobacco-related illness, a form of compensatory damages, not restitution or disgorgement of profits to a victim of the unlawful sales of cigarettes. If so, that remedy is not available under the UCL.

If plaintiff seeks restitution, I question whether plaintiff is entitled to any monetary relief. Stop Youth Addiction, Inc., does not claim to be a victim of the alleged unlawful business activities of the named defendants. If it seeks restitution, therefore, it must do so on behalf of business competitors who are not before the court or minor purchasers of tobacco if they are deemed victims of the unlawful sales. However, the action was not brought on behalf of business competitors of the named defendants or minors who have purchased tobacco products and does not seek return of any money to them. An attempt by a single litigant to compel payment to the state of restitution owed to third parties who have not authorized the action raises substantial due process issues implicating the rights of both the defendant and the absent parties.[3]

Those issues arise notwithstanding plaintiff's effort to have the sums recovered paid to the State of California. Each business competitor of the more than 400 defendants, originally named in the complaint would have an individual right to seek restitution under the UCL. Arguably, the minor purchasers are victims[4] who also may sue to compel disgorgement to them of the money unlawfully obtained by defendant. Since plaintiff has not sued on their behalf in a class action, none have notice and the opportunity to opt

---

[3]I recognize that actions on behalf of absent parties seeking restitution or disgorgement to a state or local governmental entity on their behalf have been sanctioned by the Court of Appeal. (See *People* v. *Thomas Shelton Powers, M.D., Inc.* (1992) 2 Cal.App.4th 330 [3 Cal.Rptr.2d 34]; *People* ex rel. *Smith* v. *Parkmerced Co.* (1988) 198 Cal.App.3d 683 [244 Cal.Rptr. 22]; *Dean Witter Reynolds, Inc.* v. *Superior Court* (1989) 211 Cal.App.3d 758, 773 [259 Cal.Rptr. 789]; *Caro* v. *Procter & Gamble Co.* (1993) 18 Cal.App.4th 644, 661 [22 Cal.Rptr.2d 419].) Those cases and the authorities on which they relied, *State of California* v. *Levi Strauss & Co.* (1986) 41 Cal.3d 460 [224 Cal.Rptr. 605, 715 P.2d 564] and *Fletcher* v. *Security Pacific National Bank, supra,* 23 Cal.3d 442, 450, are distinguishable. In some the recovery was by a governmental agent and was to be held for distribution to victims of the unfair business practice. *Fletcher* was brought as a class action. We stated there that the court might order restitution to the class or, if the class action was precluded, relief ancillary to an injunction. (23 Cal.3d at pp. 453-454.) We did not discuss the due process implications of an order for disgorgement of profits for which absent parties, who had no notice, retained a right to sue. Here, no provision is made for locating and reimbursing the victims, and the State of California opposes the prosecution of this lawsuit. It has not offered to act as a surrogate for the victims. Thus none of the protections available to absent parties and to defendants in a class action are available here.

[4]Consumers have been recognized as "victims" of unfair business practices such as deceptive conduct (*Podolsky* v. *First Healthcare Corp.* (1996) 50 Cal.App.4th 632 [58 Cal.Rptr.2d 89]) and illegally excessive pricing (*People* v. *Thomas Shelton Powers, M.D., Inc., supra,* 2 Cal.App.4th 330).

out of the litigation, and none is bound by the outcome of the lawsuit. The action has no res judicata or collateral estoppel effect[5] on UCL actions by those persons authorized by section 17203. Thus, regardless of whether plaintiff is successful in this action and Lucky Stores, Inc., is required to disgorge the profits made on unlawful sales to minors, it is subject to suit and potentially to pay restitution for the same sales to any business competitor harmed by the unfair business practices of defendants and, possibly to the individual purchasers as well.

A similar, but less egregious, attempt to obtain restitution on behalf of absent parties in a UCL action was rejected in *Bronco Wine Co.* v. *Frank A. Logoluso Farms* (1989) 214 Cal.App.3d 699 [262 Cal.Rptr. 899]. There the court was concerned with ensuring due process to the absent parties even though the restitution was to be paid to those parties. I said then, and continue to believe, that "[t]he procedure utilized with regard to the nonpart[ies] raises serious fundamental due process considerations." (*Id.* at p. 717.) Rendering a judgment for or against a nonparty to a lawsuit may constitute denial of due process under the United States and California Constitutions. (*Lambert* v. *California* (1957) 355 U.S. 225, 228 [78 S.Ct. 240, 242-243, 2 L.Ed.2d 228]; *Twining* v. *New Jersey* (1908) 211 U.S. 78, 110-111 [29 S.Ct. 14, 24-25, 53 L.Ed. 97].) Due process is denied because the nonjoined party has not been given notice of the proceedings or an opportunity to be heard. (*Ibid.*) Notice and a chance to be heard are essential components to the trial court's jurisdiction and for due process. Without jurisdiction over the parties, an in personam judgment is invalid. (*Environmental Coalition of Orange County, Inc.* v. *Local Agency Formation Com.* (1980) 110 Cal.App.3d 164, 173 [167 Cal.Rptr. 735].)

"For over 50 years California has recognized that a judgment may not be entered either for or against one who is not a party to an action or proceeding. [Citations.]" (*Bronco Wine Co.* v. *Frank A. Logoluso Farms, supra,* 214 Cal.App.3d at p. 717.)

The rights of prospective UCL plaintiffs here cannot be foreclosed by the action of Stop Youth Addiction, Inc., which might agree to settle the claim for less than its worth, may not competently prosecute the lawsuit, and which seeks payment to the state of sums actually due to the prospective

---

[5]"[A] party will be collaterally estopped from relitigating an issue only if (1) the issue decided in a prior adjudication is identical with that presented in the action in question; *and* (2) there was a final judgment on the merits; *and* (3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication. [Citation.] This requirement of identity of parties or privity is a requirement of due process of law." (*Clemmer* v. *Hartford Insurance Co.* (1978) 22 Cal.3d 865, 874 [151 Cal.Rptr. 285, 587 P.2d 1098], original italics; *Bernhard* v. *Bank of America* (1942) 19 Cal.2d 807, 812-813 [122 P.2d 892].)

plaintiffs. Thus defendants are subject to suit seeking restitution of the same profits by competitors and, possibly, the minor purchasers of tobacco products.

While *Bronco Wine Co.* v. *Frank A. Logoluso Farms, supra,* 214 Cal.App.3d 699, addressed only the due process rights of the absent parties, its recognition that those parties are not bound by the judgment makes the potential for denial of the rights of the defendants in an action such as this clear. It cannot have been the intent of the Legislature which enacted the UCL when it authorized "any person" to prosecute a UCL action that private parties be permitted to seek the restitution relief for which it provides on behalf of third parties who have not authorized the action, who have no notice of the action, and who may themselves bring individual actions.[6]

Therefore, while I concur in the judgment, I do so reluctantly because I do not believe that actions of this kind were contemplated by the Legislature and fear that if permitted they may compromise the due process rights of persons with a legitimate interest in restraining unfair competition in the business arena.

**BROWN, J.**—I dissent.

Since 1972, litigation under the so-called unfair competition law (Bus. & Prof. Code, §§ 17200-17209; (hereafter UCL or the Law)) has been a growth industry. According to the author of a recent study by the state's Law Revision Commission, the California Law is unique. "No statute of which we are aware in this state or nation confers the kind of unbridled standing to so many without definition, standards, notice requirements, or independent review . . . . [I]t is unclear who can sue for whom, what they have to do, whether it is final, and as to whom." (Fellmeth, *Unfair Competition Act Enforcement by Agencies, Prosecutors, and Private Litigants: Who's on First?* (Winter 1995) 15 Cal. Regulatory L. Rptr., pp. 1, 11 (hereafter Fellmeth).) Largely as a result of judicial interpretations, the commission's tentative recommendation concluded, the Law fails to provide "any mechanism to distinguish between" plaintiffs with genuine business disputes, "true" private attorneys general, and those who use the Law as a means of leveraging settlements at the expense of the public interest. (Tent. Recommendation, Unfair Competition Litigation (May 1996) Cal. Law Revision Com. Rep.,

---

[6]An action like that brought here by Stop Youth Addiction, Inc., is distinguishable from a UCL action brought by a governmental entity seeking disgorgement of profits to that entity when consumer victims cannot be identified and are unlikely to sue, but provision is made for a pro rata payment to those who are identified and for use of the balance of the recovery for the benefit of similar consumers. (See, e.g., *People* v. *Thomas Shelton Powers, M.D., Inc., supra,* 2 Cal.App.4th 330.)

Summary of Tent. Recommendation, p. 5.) This case is a poster child for just this sort of abusive litigation.

Stop Youth Addiction, Inc., is a for-profit corporation. Its sole shareholder is the mother of the corporation's attorney. He filed this lawsuit against 431 retailers. According to the 28-line, page-and-a-half-long complaint, each of the defendants violated section 308 of the Penal Code by selling cigarettes to minors. Because Penal Code section 308 makes such sales a crime, the corporation alleges they are "unlawful" within the meaning of the UCL, thereby furnishing the statutory "predicate" for this suit. The complaint seeks $10 *billion* in restitution as an incident to an injunction against defendants, and attorney fees. The case is one of eight nearly identical suits filed in multiple venues by the same attorney.[1] All told, more than $50 billion in restitution as well as injunctive relief is sought against almost 2,000 defendants, most of whom appear to be small retailers. Each suit seeks attorney fees. Defendants are informed by correspondence from Stop Youth Addiction's attorney that it "will get the most in attorney fees from whoever stays in [the suit] longest."

The record includes portions of the deposition transcript of Carol Levy, the mother of Stop Youth Addiction's attorney, taken in related litigation. (Stop Youth Addiction, Inc. v. Southland Corporation, *supra*, No. 94-V-072446-C). Mrs. Levy testified that she and her son decided to form Stop Youth Addiction in July 1994. Before that, the two had filed six lawsuits against "computer software packages [*sic*]." Stop Youth Addiction, according to Mrs. Levy's deposition, is a for-profit corporation in which she "bought stocks" for "a thousand dollars." The corporation has no other source of funding. It has no employees. It rents office space in the same building as its attorney. His sole compensation is "from people who lost their cases, he gets attorney fees." Mrs. Levy has no minor children; the corporation's only business is filing lawsuits.

The record also includes a memorandum decision of the Yolo County Superior Court denying Stop Youth Addiction's request for interim injunctive relief in the Southland litigation. Judge Warriner "note[d] with concern the evidence of attempts by . . . [Stop Youth Addiction's attorney] to obtain

---

[1]Stop Youth Addiction, Inc. v. Southland Corporation (Super. Ct. Yolo County, 1994, No. 94-V-072446-C); Stop Youth Addiction, Inc. v. Customer Co. (Super. Ct. Solano County, 1994, No. L003830); Stop Youth Addiction, Inc. v. Marina Supermarkets, Inc. (Super. Ct. S. F., 1994, No. 964907); Stop Youth Addiction, Inc. v. Albertson's, Inc. (Super. Ct. Sacramento County, 1994, No. 543941); Stop Youth Addiction, Inc. v. Chevron U.S.A. (Super. Ct. San Mateo County, 1994, No. 390046); Stop Youth Addiction, Inc. v. Exxon (Super. Ct. San Joaquin County, 1994, No. 282126); Stop Youth Addiction, Inc. v. Nob Hill Foods (Super. Ct. Santa Clara County, 1994, No. 745152).

. . . payments from franchisee defendants *prior* to filing the lawsuit (in which they would be accused of committing a crime), in exchange for dropping their names from the action." (Italics added.)

Finally, it also appears from the record in the Southland case and from concessions during oral argument that Stop Youth Addiction employed children as decoys in privately run "sting" operations to obtain evidence of illegal cigarette sales by some or all of the defendants.

## I. STATUTORY CONSTRUCTION

The transformation of the UCL began in 1972, with this court's decision in *Barquis* v. *Merchants Collection Assn.* (1972) 7 Cal.3d 94 [101 Cal.Rptr. 745, 496 P.2d 817] (*Barquis*), a case in which we adopted a "sweeping" construction of the Law, broadening both its standing provision and conduct falling within its ambit. We concluded that Business and Professions Code section 17204 (hereafter section 17204) authorized prosecutions by " 'the Attorney General [and other public attorneys] . . . *or* by any person acting for the interests of itself, its members or the general public.' " (*Barquis*, *supra*, at p. 109, italics added.) The majority reaffirms that interpretation today, holding the UCL confers universal standing, reaches " ' "anything that [is] . . . a business practice and that . . . is forbidden by law" ' " (*People* v. *McKale* (1979) 25 Cal.3d 626, 632 [159 Cal.Rptr. 811, 602 P.2d 731]), and makes the existence of a private right of action conferred by the underlying statute "immaterial," because "any unlawful business practice . . . may be redressed by a private action" under the UCL (*Committee on Children's Television, Inc.* v. *General Foods Corp.* (1983) 35 Cal.3d 197, 210-211 [197 Cal.Rptr. 783, 673 P.2d 660]). (See maj. opn., *ante*, at pp. 561-563.)

That result is compelled, the majority concludes, because the language of section 17204 "plainly suggests" the Legislature meant to confer standing on anyone and everyone without any limitations. (Maj. opn., *ante*, at p. 561.) But that interpretation runs afoul of significant grammatical impediments. Section 17204 provides: "Actions for any relief pursuant to this chapter shall be prosecuted exclusively in a court of competent jurisdiction by the Attorney General or any district attorney or by any county counsel authorized by agreement with the district attorney in actions involving violation of a county ordinance, or any city attorney of a city, or city and county, having a population in excess of 750,000, and, with the consent of the district attorney, by a city prosecutor in any city having a full-time city prosecutor or, with the consent of the district attorney, by a city attorney in any city and county in the name of the people of the State of California upon their own complaint or upon the complaint of any board, officer, person, corporation or

association or by any person acting for the interests of itself, its members or the general public." (§ 17204.)

The majority's construction makes the main clause superfluous and fails to account for other language in the statute—"in the name of the people of the State of California," "upon the complaint of," and "exclusively," for example; these words must have *some* meaning. A narrower reading of the statute—one that channels UCL litigation through government prosecutors who file actions in the name of the people—is not only grammatically sound, it would explain why the drafters failed to insert *any* qualification on standing. Indeed, this "gatekeeper" construction of the text is the only one consistent with rudimentary notions of procedural fairness.

The same inherent limitations should temper our understanding of the term "unlawful" in the context of a UCL action. The focus of the UCL is competitive *injury*, not general disgruntlement. Construing the 1963 amendment adding the word "unlawful," as we did in *Barquis*, to extend the statute's reach to "anything that can properly be called a business practice and that at the same time is forbidden by law" (Note, *Unlawful Agricultural Working Conditions as Nuisance or Unfair Competition* (1968) 19 Hastings L.J. 398, 408-409, fn. omitted) means the statute is completely disconnected from any notion, not only of competitive harm, but any injury at all. The *Barquis* court concluded the language of then section 3369 of the Civil Code did not "limit its coverage to . . . 'deceptive' practices, but instead explicitly extends to any 'unlawful, unfair *or* deceptive business practice'; the Legislature, in our view, intended by this sweeping language to permit tribunals to enjoin on-going *wrongful business conduct in whatever context* such activity might occur." (*Barquis, supra,* 7 Cal.3d at p. 111, fn. omitted, second italics added.)

Again, there is evidence supporting a much more modest mandate. According to a contemporaneous analysis prepared by the amendment's sponsor, the Attorney General, Assembly Bill No. 2929 (1963 Reg. Sess.) was intended to make clear that the Law applied to business conduct that, while "unfairly" competitive, was not fraudulent. (Mem. from Charles A. James, Cal. Dept. of Justice, to Assemblyman Phillip L. Soto, dated June 14, 1963.) The 1963 amendment thus extended the Law's reach beyond fraudulent business practices to encompass those that were "unlawful." As the Attorney General's memorandum makes clear, however, it was not intended to confer standing on the universe at large to enjoin, as a recent Court of Appeal opinion put it, "any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory regulatory, or court-made." (*Saunders v. Superior Court* (1994) 27 Cal.App.4th 832, 838-839 [33 Cal.Rptr.2d 438]

[relying on *People* v. *McKale, supra,* 25 Cal.3d at p. 632].) And it was certainly not intended to encompass criminal proceedings lying within the exclusive, constitutionally assigned powers of public prosecutors.

It is one thing to assert that business conduct that is illegal and competitively *harmful* (in his 1963 analysis, the Attorney General cited a funeral home's violation of a zoning ordinance) may be enjoined. It is only a slight extension to assert that someone *injured* by a fraudulent business practice may seek to have it enjoined under the Law. It is a radically different thing to say—as *Barquis* and subsequent decisions have said—that the *only* requirement for private litigation under the Law is that the defendant's conduct be denounced, somewhere, somehow, by someone, as "unlawful," and that on that basis alone *anyone* has standing to file a UCL action for injunctive relief and attorney fees.

It is also worth noting that the UCL's location in the Business and Professions Code comes just after the Cartwright Act and the Unfair Practices Act, and that both of these statutes require a showing of actual injury as a condition of standing to sue. (See Bus. & Prof. Code, §§ 16750, 17071.) In short, even if the majority is correct in construing section 17204 to permit private enforcement, it does not necessarily follow that *no* limits are imposed on private actions. A requirement of actual injury, as under the Cartwright and Unfair Practices Acts, would at least link UCL litigation to its underlying purpose.

## II. Separation of Powers

The *Barquis* court's endorsement of an unqualified, universal public standing to sue under the UCL, without any requirement that a plaintiff show anything more than a "public interest," also has untoward constitutional implications. It undermines the separation of powers in multiple ways: by granting private actors the right to vindicate the public interest, by extinguishing the historical limits on the right of private litigants to invoke the remedial powers of the courts, and by depriving the executive of its constitutionally assigned discretion to enforce the Law.

### A. *Standing*

Conferring on every resident of the state the power to vindicate the public interest raises substantial separation of powers issues. The United States Supreme Court recently invalidated, on separation of powers grounds, a similar federal "citizen suit" standing provision. "Vindicating the *public* interest . . . " the court said, "is the function of Congress and the Chief

Executive. The question presented here is whether the public interest . . . can be converted into an individual right by a statute that denominates it as such, and that *permits all citizens . . . to sue.* If the concrete injury requirement has the separation-of-powers significance we have always said, the answer must be obvious: To permit Congress to convert the undifferentiated public interest into an 'individual right' vindicable in the courts is to permit Congress to transfer from the President to the courts the Chief Executive's most important constitutional duty, to 'take Care that the Laws be faithfully executed,' Art. II, § 3. It would enable the courts, with the permission of Congress, 'to assume a position of authority over the governmental acts of another and co-equal department,' [citation] and to become ' "virtually continuing monitors of the wisdom and soundness of Executive action." ' " (*Lujan* v. *Defenders of Wildlife* (1992) 504 U.S. 555, 576-577 [112 S.Ct. 2130, 2145, 119 L.Ed.2d 351], second italics added; see also *Morrison* v. *Olson* (1987) 487 U.S. 654 [108 S.Ct. 2597, 101 L.Ed.2d 569]; *Allen* v. *Wright* (1984) 468 U.S. 737, 752 [104 S.Ct. 3315, 3325, 82 L.Ed.2d 556] [". . . the law of . . . standing is built on a single basic idea—the idea of separation of powers . . . . Of course, both federal and state courts have long experience in applying and elaborating in numerous contexts the pervasive and fundamental notion of separation of powers."]; *Valley Forge College* v. *Americans United* (1982) 454 U.S. 464, 486-487 [102 S.Ct. 752, 766, 70 L.Ed.2d 700] ["The federal courts were simply not constituted as ombudsmen of the general welfare."]; *United States* v. *SCRAP* (1973) 412 U.S. 669, 687, 688 [93 S.Ct. 2405, 2416, 37 L.Ed.2d 254] [standing to sue "prevents the judicial process from becoming no more than a vehicle for the vindication of the value interests of concerned bystanders"; "pleadings must be something more than an ingenious academic exercise in the conceivable."].)

The passage from *Lujan* quoted above fairly describes the effect of judicial constructions of the scope of section 17204 of the UCL over the past 25 years. *Lujan* and similar decisions are based in part on article III, section 2 of the federal Constitution, the case or controversy provision that is the source of much of the federal law of standing. That article does not bind our courts nor does the California Constitution have a textually similar provision. Our Constitution is, however, structurally similar in important ways to the United States Constitution; both include provisions imposing a tripartite form of government. (U.S. Const., arts. I, II, III; Cal. Const., art. III, § 3.) Moreover, both the United States Supreme Court and California courts have acknowledged that the source of the separation of powers doctrine is the constitutional requirement of a divided, tripartite form of government. (See, e.g., *Allen* v. *Wright, supra,* 468 U.S. at p. 752 [104 S.Ct. at p. 3325]; *State of California* v. *Superior Court* (1986) 184 Cal.App.3d 394, 397 [229

Cal.Rptr. 74].) In analyzing the separation of powers provision of the California Constitution, we have relied on United States Supreme Court case law construing the federal separation of powers provisions. (See, e.g., *Hustedt* v. *Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 329, 338 [178 Cal.Rptr. 801, 636 P.2d 1139] [relying on *Buckley* v. *Valeo* (1976) 424 U.S. 1 [96 S.Ct. 612, 46 L.Ed.2d 659]]; *Davis* v. *Municipal Court* (1988) 46 Cal.3d 64, 78 [249 Cal.Rptr. 300, 757 P.2d 11] [relying on *Nixon* v. *Administrator of General Services* (1977) 433 U.S. 425, 443 [97 S.Ct. 2777, 2790, 53 L.Ed.2d 867]]; see also *Butt* v. *State of California* (1992) 4 Cal.4th 668, 707 [15 Cal.Rptr.2d 480, 842 P.2d 1240] (conc. and dis. opn. of Kennard, J.) [federal Supreme Court separation of powers decisions "supply a persuasive body of case authority" in interpreting the California provision].)

Both the federal high court and our Courts of Appeal have also held that limitations on a litigant's entitlement to seek judicial relief—his standing—are derived from and enforce the constitutional doctrine of separation of powers. Standing limitations on who can invoke the power of the courts are traceable, in other words, to constitutional requirements derived from the tripartite structure of both governments. (See, e.g., *Allen* v. *Wright, supra,* 468 U.S. at p. 751 [104 S.Ct. at pp. 3324-3325]; *People* v. *Municipal Court* (1972) 27 Cal.App.3d 193, 207 [103 Cal.Rptr. 645, 66 A.L.R.3d 717].) For one arm of government to exercise an "essential power" of another threatens the constitutional integrity of the coordinate branch. The doctrine of standing serves as a judicial means of preventing one branch from exercising a constitutional power that properly belongs to another.

## B. *Delegation*

The doctrine of improper delegation also serves to resist efforts by one branch of government to usurp functions constitutionally assigned to another branch. (See, e.g., *Bayside Timber Co.* v. *Board of Supervisors* (1971) 20 Cal.App.3d 1, 11-12 [97 Cal.Rptr. 431]; Hamilton et al., The Federalist Papers, No. 70 (Rossiter ed. 1961) pp. 423-431; cf. *Boll Weevil Eradication Found.* v. *Lewellen* (Tex. 1997) 952 S.W.2d 454, 465-467; *Kuttner* v. *Cuomo* (1989) 147 A.D.2d 215 [543 N.Y.S.2d 172, 174].) Thus, the Legislature may not invest a private body with the power to draft rules having the effect of law; to do so would unconstitutionally transfer powers confided to one arm of government to private parties. (*Bayside Timber Co., supra,* 20 Cal.App.3d at pp. 11-12.) By requiring that the transfer of essential powers—whether from one arm to another or to a private group or person—be accompanied by the retention of controls sufficient for the delegating arm to retain ultimate power over their exercise, the delegation doctrine preserves the integrity of

divided government. In the absence of such controls, the powers of one arm of government are weakened while those of another are expanded.

Over the last quarter century the effect of judicial constructions of the UCL has been to weaken the power of the executive branch while strengthening the power of the judiciary. To paraphrase the high court's opinion in *Lujan*, it has converted the undifferentiated public interest into an individual right vindicable in the courts, transferring from the executive its most important constitutional duty, to see that that the law is faithfully executed. (*Lujan v. Defenders of Wildlife, supra,* 504 U.S. at p. 577 [112 S.Ct. at p. 2145]; Cal. Const., art. V, §§ 1, 13.) The courts are thereby enabled " 'to assume a position of authority over the governmental acts of another and co-equal department,' [citation] and to become ' "virtually continuing monitors of the wisdom and soundness of Executive action." ' " (*Lujan v. Defenders of Wildlife, supra,* at p. 577 [112 S.Ct. at p. 2145].)

C. *Injury in Fact*

One aspect of this judicial gloss has been the absolute extinction in private litigation under the UCL of the historical requirement that before would-be litigants may invoke the remedial powers of the courts, they must demonstrate the existence of some concrete harm, some injury in fact that qualifies as the type of grievance the courts were established to hear and for which they are authorized to grant relief. "The province of the courts," as Chief Justice Marshall explained, "is, solely, to decide on the rights of individuals." (*Marbury v. Madison* (1803) 5 U.S. (1 Cranch) 137, 170 [2 L.Ed. 60, 71].) So long as litigation under the UCL is limited to the Attorney General and the other public prosecutors enumerated in section 17204, so long, that is, as the gatekeeper interpretation of standing under the UCL prevails, there is no threat to the separation of powers. As members of the executive branch, these officials are charged by the Constitution with vindicating the public interest. And so long as a *private litigant* suing under the UCL is able to allege and prove a species of judicially cognizable *harm*, private suits under the UCL do not raise significant separation of powers concerns, either. De Tocqueville, writing over 160 years ago, understood the role of actual injury as a condition to a lawsuit: "It will be seen . . . that by leaving it to private interest to censure the law, and by intimately uniting the trial of the law with the trial of an individual, legislation is protected from wanton assaults and from the daily aggressions of party spirit. The errors of the legislator are exposed only to meet a real want; and it is always a positive and appreciable fact that must serve as the basis of a prosecution." (De Tocqueville, Democracy in America (Ryan ed. 1994) p. 102.)

Here, of course, that requirement is not met. Stop Youth Addiction has not alleged any harm from anything these defendants have done. It sues on the

basis of the most general of grievances, one shared by all of us who believe that underage access to tobacco is a threat to the health of the children of California. The absence of any requirement that a private UCL plaintiff demonstrate some cognizable harm as a condition of maintaining suit also has other concrete and damaging effects on the separation of powers.

### D. *Prosecutorial Discretion*

Prosecutorial discretion, the "decision to charge," is a fundamental aspect of executive power, one our courts have held on separation of powers grounds is not subject to judicial control, either directly or indirectly. (*People* v. *Cimarusti* (1978) 81 Cal.App.3d 314, 323 [146 Cal.Rptr. 421]; *People* v. *Smith* (1975) 53 Cal.App.3d 655, 658 [126 Cal.Rptr. 195].) That principle extends to the decision to institute *civil* proceedings—a decision "analogous to a criminal proceeding with respect to the division of power between the executive and judicial branches of the government." (*People* v. *Cimarusti, supra,* at p. 323.) In both cases, "the charging function [lies] within the exclusive control of the executive." (*Ibid.*) If the executive, in the form of the public prosecutor, determines that a case has no merit and refuses to bring suit, the separation of powers doctrine bars a court from compelling it. (*Dix* v. *Superior Court* (1991) 53 Cal.3d 442, 451 [279 Cal.Rptr. 834, 807 P.2d 1063] ["The prosecution of criminal offenses on behalf of the People is the sole responsibility of the public prosecutor."]; *State of California* v. *Superior Court, supra,* 184 Cal.App.3d at p. 397 [judicial trespass on the Attorney General's internal policy is close to violation of constitutional mandate].) That principle is basic to our form of government.

It is impossible, of course, for every violation of every public law to be redressed by executive action. That does not mean, however, that the answer lies in permitting anyone who wishes to file a lawsuit to do so. Instead, the answer resides in public confidence that executive officials charged with enforcing the law will exercise an informed discretion that will maximize the effectiveness of their powers, while observing the canons of fundamental fairness that govern our public life. The United States Supreme Court has said that prosecutorial discretion "rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake." (*Wayte* v. *United States* (1985) 470 U.S. 598, 607 [105 S.Ct. 1524, 1530, 84 L.Ed.2d 547].)

Yet because so much enforcement under the UCL has been delegated to private prosecution, discretion has effectively been placed beyond the range

of political accountability. As this case suggests, without ties to an elected executive, enforcement under the UCL becomes random and out of control. Unelected, unaccountable private enforcers, unrestrained by established notions of concrete harm or public duty, seek to advance their own agendas or to deploy the Law as leverage to increase attorney fees. Of course, the decision to enforce or to forego enforcement in a particular case is the essence of prosecutorial discretion. Just as underenforcement may lead to a statute's nullification, *over*enforcement may lead to a blindly self-interested and unmodulated arbitrariness, and to vexatious and frivolous litigation. Unlike prosecutors, whose authority is curbed by established notions of ethical responsibility, private enforcement of the UCL is unchecked and unfettered. The potential for abuse in such a system is manifest.

That observation brings us full circle back to the UCL standing provision and how it should be construed. Because a judicial construction of section 17204 that confers universal citizen standing to enforce the UCL threatens the constitutional separation of powers, we are duty bound to adopt a construction that avoids that threat, especially when the statutory text accommodates such an alternative interpretation. (*Ashwander* v. *Valley Authority* (1936) 297 U.S. 288, 347-348 [56 S.Ct. 466, 483, 80 L.Ed. 688] (conc. opn. of Brandeis, J.); cf. *Loder* v. *City of Glendale* (1997) 14 Cal.4th 846, 859 [59 Cal.Rptr.2d 696, 927 P.2d 1200].)

### III. PRIVATE ENFORCEMENT OF PENAL STATUTES

Until today, California has followed the unanimous American rule that the enforcement of penal statutes is the exclusive province of public prosecutors. The reason is obvious: Their activities are governed by rules designed to ensure the public virtue of a disinterested fairness and an impersonal neutrality. Penal Code section 308 is a criminal statute; its private enforcement is not only inappropriate, but explicitly proscribed. Despite disclaimers to the contrary, this suit is functionally a proceeding under the Penal Code; and its enforcement lies exclusively within the powers allocated to the executive branch. Penal Code section 308 divides enforcement of its prohibition on furnishing tobacco to minors into two kinds of proceedings—a misdemeanor prosecution and a civil action. If the charge in either proceeding is sustained, the penalty is a fine, imposed according to a graduated schedule.

In *Bravo Vending* v. *City of Rancho Mirage* (1993) 16 Cal.App.4th 383 [20 Cal.Rptr.2d 164], the Court of Appeal understood this arrangement. After reviewing the statute, it concluded that "the regulatory field preempted by section 308 is that of the penal—i.e., both criminally and *civilly proscribed*—

aspects of the sale of cigarettes to minors: To whom is it illegal to sell cigarettes, and what are the penal consequences of doing so?" (*Id.* at p. 403, italics added.) "[E]very provision [of the statute]," the court said, "deals directly with the proscription, prosecution, or punishment of the sale or other distribution of cigarettes to, and the . . . receipt of cigarettes by, minors." (*Ibid.*) Penal Code section 308, in other words, comprehends the universe of penal sanctions—both criminal *and* civil—for the sale of tobacco to minors.

Like a civil proceeding brought by a prosecutor under Penal Code section 308, this UCL suit also seeks monetary sanctions based on criminal conduct. Its effect—certainly on defendants—is *virtually* the same as if it had been brought directly under the Penal Code. But because of its "double-sided" structure, Penal Code section 308 leaves no room for private enforcement. Conferring unrestricted discretion on a private bounty hunter to seek restitution, injunctive relief, and attorney fees from literally thousands of small retailers on the basis of alleged violations of a penal statute is not materially different from the bifurcated scheme of Penal Code section 308 itself. There is one important difference, however: This privately prosecuted UCL litigation has *none* of the fundamental attributes of a "true" criminal proceeding— the assurance of detachment, neutrality, and evenhandedness—that inhere in the idea of the public prosecutor and that sustain, among the public at large and individual defendants, respect for law.

Because Penal Code section 308 is a penal statute with both criminal *and* civil "sides," a citizen suit under the UCL based upon it for comparable relief is not a private, civil analogue to a criminal prosecution. Instead, it is a kind of private usurpation of a criminal enforcement power conferred exclusively on a class of executive officers. The United States Supreme Court and this court have articulated the core meaning of this quintessential executive function. The prosecutor has been described as "the representative not of an ordinary party . . . but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done." (*Berger* v. *United States* (1935) 295 U.S. 78, 88 [55 S.Ct. 629, 633, 79 L.Ed. 1314].) We have taken a like view, stating that "[s]ociety also has an interest in both the reality and the appearance of impartiality by its prosecuting officials." (*People* v. *Superior Court* (*Greer*) (1977) 19 Cal.3d 255, 268 [137 Cal.Rptr. 476, 561 P.2d 1164].)

The central concern of the case law prohibiting private interests in criminal prosecutions is the likelihood that bias may deflect the prosecutor's focus from the public interest. The Supreme Court has said that a "scheme injecting a personal interest, financial or otherwise, into the enforcement

process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions." (*Marshall* v. *Jerrico, Inc.* (1980) 446 U.S. 238, 249 [100 S.Ct. 1610, 1617, 64 L.Ed.2d 182].) We recently relied on these same concerns, ordering the recusal of a prosecutor in light of a conflict produced by payment of part of the cost of the criminal investigation by the victim. (*People* v. *Eubanks* (1996) 14 Cal.4th 580 [59 Cal.Rptr.2d 200, 927 P.2d 310].) "[A] prosecutor may have a conflict," we said, "if institutional arrangements link [the office] too closely to a private party . . . who in turn has a personal interest in the defendant's prosecution and conviction." (*Id.* at p. 596.) If private financial interests are "of [such] a nature and magnitude" that they are "likely to put the prosecutor's discretionary decisionmaking within the influence or control of an interested party," the prosecutor has a "disabling conflict" requiring recusal. (*Id.* at p. 599.) A *direct* financial benefit as a result of the outcome of a proceeding is even more offensive. (*People* ex rel. *Clancy* v. *Superior Court* (1985) 39 Cal.3d 740, 747-748, 750 [218 Cal.Rptr. 24, 705 P.2d 347] [prosecutor's contingent fee arrangement required disqualification; his direct, personal interest was "antithetical to the [prosecutor's] standard of neutrality"].)

## IV. A JURISPRUDENCE OF ABSTENTION

The result the majority reaches is not compelled by law or logic. It can prevail only at the expense of fairness and constitutional balance. Judges, however, possess an inherent power to restrain their own precedents in light of perceptions that past constructions of legislation have produced anomalous and harmful results, or that continuing expansive interpretations will impinge upon constitutional prerogatives. All of these concerns are implicated here. Not only does this private suit under the UCL threaten important interests of constitutional dimension, it is also inconsistent with the Legislature's strategy to ban children's access to tobacco and the health threat posed by its use. That strategy, embodied in Penal Code section 308 and the Stop Tobacco Access to Kids Enforcement Act (Bus. & Prof. Code, §§ 22950-22959), is placed at risk by suits like this one. Private UCL litigation based on Penal Code section 308 may impair coordinated, statewide prosecution efforts, including the exercise of discretion under the divided penalty scheme of the statute. This case is proof of the comment, made by the author of the Law Revision Commission's report, that UCL litigation is like a Bosnian war zone: "Anyone may attack for any reason and it appears that nobody can negotiate—not only are there factions, but it is unclear who has *authority* to bind anyone to peace or a final resolution." (Fellmeth, *supra*, 15 Cal. Regulatory L. Rptr. at p. 2, original italics.)

It is equally evident that no means exists in these cases—short of an actual trial—to assure the public that any of the small retailers that may *already*

have settled rather than pay the cost of lawyers are factually guilty of having committed the underlying crime on which these suits rest. Allegations in the record that plaintiff's counsel offered to forego even *filing* suit against individual defendants in exchange for fees, testimony that counsel is compensated exclusively from such fees, and evidence that he systematically offers to settle on terms that include attorney fees but no legally binding relief are equally disturbing. They suggest the use of the UCL as a means of generating attorney fees without any corresponding public benefit.

Any empathy for the result the majority reaches vanishes when the logistics of this suit are considered: In order to obtain evidence of alleged unlawful activity, Stop Youth Addiction's agents must induce minors to commit crimes—repeated violations of section 308—by purchasing cigarettes. It thus appears from the record that Stop Youth Addiction and its attorney have filed this and related UCL actions against thousands of retailers alleging violations *of the same penal law that Stop Youth Addiction has violated in obtaining evidence to support these suits*. And while retailers may have done so inadvertently, Stop Youth Addiction has acted deliberately. The result is so exquisitely ridiculous, it would confound Kafka. In a case that abounds with moral ironies, the worse is this: The avenger may be guilty of the greater crime.

The utility of private UCL suits based on Penal Code section 308 is also problematic. Granting injunctive relief against a few retailers—even a thousand—in a series of private unfair competition suits is not likely to have a measurable impact on the availability of cigarettes to minors. Even if a statewide flood of such private litigation were to succeed, it would raise the prospect of inconsistent rulings where the need for uniform, statewide enforcement standards under executive control is evident. Given the wide availability of cigarettes to children and the long-term health consequences of their use, the kind and level of regulatory effort needed to combat the threat is an issue for legislative and executive decisionmakers. The right answer implicates a calculus of costs versus results, the optimal allocation of public resources, consistency of regulatory effort, suitability of judicial enforcement, and a host of related issues. The fact the Legislature has adopted an institutional framework for dealing with the problem undermines the utility of privately prosecuted unfair competition suits as a statewide solution to a statewide medical and social problem. (See, e.g., *Crusader Ins. Co. v. Scottsdale Ins. Co.* (1997) 54 Cal.App.4th 121, 137-138 [62 Cal.Rptr.2d 620].)

Although California courts have not yet developed the doctrine fully, the fundamentals of an equitable jurisprudence of abstention in litigation

brought under the UCL exists under both the California Constitution (art. III, § 3) and case law. As the cases summarized below show, the Courts of Appeal have done an admirable job of reining in the UCL's potential for adverse regulatory effects by declining to grant relief in appropriate cases.[2] Other California decisions have recognized that so-called "prudential" standing considerations—those judicially crafted limitations on a court's willingness to grant equitable relief—have a remedial component that prevents the judiciary from intruding too deeply into matters allocated to coordinate branches. (See, e.g., *Smith* v. *Fair Employment & Housing Com.* (1996) 12 Cal.4th 1143, 1188-1189 [51 Cal.Rptr.2d 700, 913 P.2d 909] (conc. opn. of Mosk, J.); *Cornelius* v. *Los Angeles County etc. Authority* (1996) 49 Cal.App.4th 1761, 1779, fn. 8 [57 Cal.Rptr.2d 618].) In cases such as this, where judicial constructions of the UCL have permitted self-appointed champions of the public interest to roam unhindered over the breadth of our public law, California courts should exercise their equitable powers of abstention in appropriate cases and decline to grant relief. Instead, the majority chooses to speed us along the path to perdition, genially opting for the "worst of all possible legal worlds: abuse of process . . . extortionate nuisance lawsuits, . . . confusion and duplication of litigation resources and uncertain finality." (*Fellmeth, supra,* 15 Cal. Regulatory L. Rptr. at p. 11.)

---

[2]See, e.g., *Crusader Ins. Co.* v. *Scottsdale Ins. Co., supra,* 54 Cal.App.4th at page 138 ("Institutional systems are . . . in place to deal with the problem [raised in this UCL suit] . . . . There is no need or justification for the courts to interfere with the Legislature's efforts to mold and implement public policy . . . by extrapolating . . . enactments into areas beyond those specified . . . ."); *Wolfe* v. *State Farm Fire & Casualty Ins. Co.* (1996) 46 Cal.App.4th 554, 564-565 [53 Cal.Rptr.2d 878] (Assuming plaintiff could state a claim that defendants' refusal to issue homeowners policies covering earthquake damage was an unfair business practice, "that by itself does not permit unwarranted judicial intervention in an area of complex economic policy. [Fn. omitted.]"); *California Grocers Assn.* v. *Bank of America* (1994) 22 Cal.App.4th 205, 218 [27 Cal.Rptr.2d 396] (" 'ad hoc decisions of the courts' " in UCL suits are "an entirely inappropriate method of overseeing bank service fees"); *Samura* v. *Kaiser Foundation Health Plan, Inc.* (1993) 17 Cal.App.4th 1284, 1301-1302 [22 Cal.Rptr.2d 20] ("[T]he courts cannot assume general regulatory powers over health maintenance organizations through the guise of enforcing" the UCL); *Diaz* v. *Kay-Dix Ranch* (1970) 9 Cal.App.3d 588, 599 [88 Cal.Rptr. 443] (Refusing to grant relief under the UCL on the ground that "[i]t is more orderly, more effectual, less burdensome to the affected interests, that the national government redeem its commitment." "Thus the court of equity withholds its aid."); *Cobos* v. *Mello-Dy Ranch* (1971) 20 Cal.App.3d 947 [98 Cal.Rptr. 131] (same ground, denying damages); *Larez* v. *Oberti* (1972) 23 Cal.App.3d 217, 221 [100 Cal.Rptr. 57] (declining to intervene under the UCL "by reason of certain considerations of expediency and policy which control . . . the exercise of equity jurisdiction"); *People* ex rel. *Dept. of Transportation* v. *Naegele Outdoor Advertising Co.* (1985) 38 Cal.3d 509, 523 [213 Cal.Rptr. 247, 698 P.2d 150] ("[S]tate court injunctive relief under the theory of unfair competition is inappropriate." "The sound counsel of the *Diaz* decision . . . mandates state abstention in reliance upon federal enforcement in this case.")

## CONCLUSION

One need only read the daily newspapers to see how much easier it is to stall legislation than to enact it; how much simpler to expand what exists than to contract it. Courts can take advantage of this political infirmity by calling it "acquiescence." The legislative problem is especially acute in cases like this one, where change threatens the balance of advantage between two politically potent and contentious groups—those who sue under the Law, and those who defend. Selling cigarettes to minors is against the law and those guilty of it should be punished. The creation of a standardless, limitless, attorney fees machine is not, however, the best way to accomplish that goal. The judicial gloss given the UCL has changed, probably forever, the perception of the role of private attorneys general. We simply cannot put this genie back into the old bottle. The Legislature at least has the wherewithal to make a new bottle. Perhaps it will also have the political will.